[Cite as *State v. Froman*, 2022-Ohio-2726.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-12-080 |
| | : | O P I N I O N |
| - vs - | | 8/8/2022 |
| | : | |
| TERRY LEE FROMAN, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 14CR30398

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Jessica Houston, Kimberlyn Seccuro, and Adam Vincent, Office of the Ohio Public Defender, for appellant.

**BYRNE, J.**

{¶1} The Warren County Court of Common Pleas convicted and sentenced Terry Froman to death for murdering his estranged former girlfriend, Kimberly Thomas. Froman appealed to the Ohio Supreme Court, which affirmed Froman's conviction and sentence. Froman separately petitioned for postconviction relief in the Warren County Court of Common Pleas. That court dismissed the postconviction relief petition ("PCR petition")

without a hearing and granted the state's motion to dismiss and/or for summary judgment. Froman now appeals from that decision. We affirm the trial court's decision for the reasons below.

## I. Procedural and Factual Background

{¶2} In 2014, a Warren County grand jury indicted Froman on two counts of aggravated murder, both with death penalty specifications, and two counts of kidnapping. The indictment stemmed from allegations that Froman kidnapped Kimberly Thomas ("Thomas") from her home in western Kentucky. He then transported Thomas by vehicle to Ohio and shot and killed her after troopers pulled him over in Warren County on I-75.

{¶3} The matter proceeded to a trial. The facts underlying the offenses are not at issue regarding most grounds for relief raised in Froman's PCR petition, and so we will only summarize them here. The Ohio Supreme Court's opinion resulting from Froman's direct appeal contains a more extensive review of the trial evidence. *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, ¶ 3-26.

{¶4} Froman and Thomas were in a romantic relationship, and Froman lived with Thomas at her home in Mayfield, Kentucky during the relationship. Thomas ended the relationship in August 2014 and asked Froman to move out. Froman eventually moved out but persisted in involving himself in Thomas' life. For example, Froman one day showed up at Thomas' workplace and entered her office. A supervisor, knowing about their troubled relationship, told Froman that Thomas had to go to a meeting. Before leaving, Froman told the supervisor, "Kim has made me lose everything, now I will make her lose everything no matter the cost." Also, after moving out, Froman twice texted a neighbor to ask if any men had been at Thomas' house.

{¶5} On the morning of September 12, 2014, the evidence showed that Froman entered Thomas' home with a gun and forced her out of bed. Thomas' son Eli was in the

home and came to his mother's aid. Froman shot and killed Eli. Investigators later found gunshot wounds on Eli's abdomen, right forearm, and the back of his head. Froman forced Thomas outside and into his vehicle and drove away.

{¶6} Froman stopped at a gas station in the nearby town of Paducah, Kentucky. While he went inside to pay, video surveillance shows that Thomas, naked, escaped from Froman's vehicle and began running away. Froman rushed out of the store, grabbed Thomas by the hair, and forced her into the backseat of his vehicle.

{¶7} Froman then fled, with Thomas still in the vehicle, to Ohio. During the long drive, he spoke on the phone with his friend, David Clark, multiple times. Clark cooperated with police in real time, and police recorded some of the phone calls. During these conversations Froman confessed that he had killed Eli and kidnapped Thomas. Clark later tried to persuade Froman to let Thomas go, but Froman refused:

> [Clark]: Have you thought about letting her go?
>
> [Froman]: Have I thought about it? No, not at all. * * *
> It's too late. I mean it ain't too late, but, I just can't,
> I can't, I can't. I just got to. No ifs, ands, or buts
> about it.
>
> * * *
>
> I mean, I know you're trying to talk me down, baby
> I appreciate it and all. But like I said, I mean it's
> just not going to happen. It's just not going to
> happen.
>
> [Clark]: There's still good stuff to live for, Fam.[1]
>
> [Froman]: Man, I already took one life, and I'm about to go
> ahead and take two [more].

{¶8} During a later phone call, Froman informed Clark that the police were following him and that he intended to kill Thomas. He refused Clark's request that he stop:

---

1. Clark referred to Froman as "Fam" several times during their recorded telephone conversations.

[Froman]:     I'm gonna kill her dude.

[Clark]:      Don't do it Fam.  Don't do it.  * * * [J]ust pull over.

* * *

[Clark]:      Well just, man, just pull over.  Don't do nothing.

[Froman]:     I can't do it man.

{¶9}  The call disconnected.  When Clark called Froman again, Froman stated, "She dead.  I shot myself."  He added, "I shot myself, and I shot her three times."

{¶10}  Police had been tracking Froman by working with his cell phone provider, which provided police with updates on his location by periodically sending a "ping" to his cell phone.  Around six hours had passed since the abduction began when two Ohio State Highway Patrol troopers pulled Froman over on I-75 in Warren County, Ohio.  The officers heard gunshots upon exiting their cruisers.

{¶11}  A brief time later, two tactical teams approached Froman's vehicle and apprehended Froman, who was sitting in the driver's seat with a gun in his hand.  Froman had a bullet wound in his left upper chest near his shoulder.  First responders transported Froman to a hospital for treatment.

{¶12}  The troopers found Thomas in the back seat of Froman's vehicle, deceased. She had bullet wounds in the back of her head, her right upper chest, her right breast, and her right upper abdomen.  She had also suffered blunt force trauma to her torso, inner thighs, and extremities, a laceration on her upper lip, three lacerations on the top of her head, and abrasions on her forehead and right cheek.  She also had a broken jaw and one of her lower teeth had been knocked out.

{¶13}  Authorities tried Froman in Kentucky for killing Eli and in Ohio for killing Thomas.  Ohio bifurcates capital trials into guilt and penalty/mitigation phases.  *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 147, citing R.C. 2929.03(D); R.C.

2929.04(B) and (C). The jury initially determines a defendant's guilt. If the jury convicts the defendant of aggravated murder and at least one death specification, then the trial proceeds to the second phase. Otherwise, the second phase never occurs. *Id.* At the end of the guilt phase of Froman's trial, the jury found Froman guilty of all the counts and specifications in the indictment. The state elected to proceed to the penalty phase on the first count of aggravated murder and its accompanying death-penalty specifications.

{¶14} At the penalty phase trial, the jury heard testimony from Alexis Froman (Froman's younger daughter) and Dr. Nancy Schmidtgoessling, a clinical psychologist who interviewed Froman while he was awaiting trial. The jury also heard Froman read an unsworn statement, in which he apologized and asked the jurors to spare his life for the sake of Alexis and his mother.

{¶15} Following the penalty phase, the jury recommended a sentence of death and the trial court subsequently sentenced Froman to death.

{¶16} As mentioned, Froman directly appealed to the Ohio Supreme Court. *Froman*, 2020-Ohio-4523. Among other arguments, Froman—who is black, and who the state accused of murdering Thomas, a white woman—argued that the state denied him a fair trial due to the seating of racially biased jurors, and that his trial counsel provided ineffective assistance in failing to question or remove one of those jurors. *Id.* at ¶ 48. He also argued that his counsel provided ineffective assistance by failing to call certain mitigation witnesses. *Id.* at ¶ 146.

{¶17} As for the allegation of racially biased jurors, the Ohio Supreme Court agreed with Froman that Juror 49's answers on a jury questionnaire indicated that she held racially biased views. *Id.* at ¶ 55. Even so, the Ohio Supreme Court found that the state had not deprived Froman of a fair trial because the court and counsel questioned Juror 49 on her views and successfully rehabilitated her. *Id.* at ¶ 57. Nor had Froman's trial counsel

provided ineffective assistance in his questioning or failure to question Juror 49 during voir dire. *Id.* The supreme court also analyzed allegedly racially biased juror questionnaire answers given by Jurors 5, 13, and 46. *Id.* at ¶ 58-61. The supreme court found that those jurors' questionnaire answers did not indicate racially biased views, and that the record did not show that they could not be impartial. *Id.* at ¶ 61.

{¶18} As for Froman's ineffective assistance claim related to mitigation evidence, the supreme court found that Froman's trial counsel's decision not to call certain mitigation witnesses was a "tactical choice," and that Froman had not established prejudice because he did not identify what specific evidence those witnesses would have offered had counsel called them to testify. *Id.* at ¶ 151-153.

{¶19} Having found no merit to Froman's arguments and having conducted its own independent evaluation of Froman's death sentence and the mitigating evidence offered during the trial's penalty phase, the Ohio Supreme Court affirmed Froman's conviction and sentence. *Id.* at ¶ 161-187.

{¶20} In October 2018, Froman petitioned for postconviction relief under R.C. 2953.21. In September 2019, Froman filed an amended petition for postconviction relief (referred to as the "PCR petition"). In his PCR petition, Froman asserted 47 grounds for relief ("Grounds"), presenting various arguments alleging that the state denied him his rights or violated those rights in ways that rendered his conviction void or voidable. Some of those arguments related to issues that he presented in his direct appeal to the Ohio Supreme Court. Froman included voluminous new documents with his PCR petition, including, but not limited to, affidavits and reports of various putative experts opining on juror bias and other issues, and affidavits of fourteen lay witnesses providing information in support of mitigation regarding his death penalty sentence.

{¶21} The state filed a motion to dismiss and/or for summary judgment ("state's

motion to dismiss") in March 2020. In November 2020, the trial court granted the state's motion. The trial court found that res judicata barred nearly all Froman's grounds for relief. But the court also substantively addressed all grounds for relief and found none had any merit. Froman appeals, raising nine assignments of error.[2]

## II. Legal Analysis

### A. Standards of Review

{¶22} R.C. 2953.21 authorizes the filing of petitions for postconviction relief. A postconviction proceeding is a collateral civil attack on a criminal judgment, not an appeal of a criminal conviction. *State v. Dillingham*, 12th Dist. Butler Nos. CA2012-02-037 and CA2012-02-042, 2012-Ohio-5841, ¶ 8. To prevail on a postconviction relief petition, the petitioner must establish a violation of his constitutional rights that renders the judgment of conviction void or voidable. R.C. 2953.21. A petition does not provide a petitioner a second opportunity to litigate his or her conviction, nor is the petitioner automatically entitled to an evidentiary hearing. *State v. Rose*, 12th Dist. Butler No. CA2012-03-050, 2012-Ohio-5957, ¶ 16. A trial court properly denies a postconviction relief petition without an evidentiary hearing if the supporting affidavits, the documentary evidence, the files, and the records of the case do not demonstrate that the petitioner set forth sufficient operative facts to establish substantive grounds for relief. *State v. Blankenburg*, 12th Dist. Butler No. CA2012-04-088, 2012-Ohio-6175, ¶ 9; R.C. 2953.21.

{¶23} "It is well-established that a trial court may dismiss a postconviction relief petition on the basis of the doctrine of res judicata." *State v. Davis*, 12th Dist. Butler No. CA2012-12-258, 2013-Ohio-3878, ¶ 30. Under res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in

---

2. Froman has appealed the dismissal of each ground for relief except for Ground 15, in which he alleged that his trial counsel were ineffective for failing to adequately prepare Dr. Schmidtgoessling.

any proceeding except an appeal from judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment or conviction, or on an appeal from that judgment. *State v. Wagers*, 12th Dist. Preble No. CA2011-08-007, 2012-Ohio-2258, ¶ 10, citing *State v. Szefcyk*, 77 Ohio St.3d 93 (1996), syllabus.

{¶24} The presentation of competent, relevant, and material evidence outside the trial record may defeat the application of res judicata. *State v. Lawson*, 103 Ohio App.3d 307, 315 (12th Dist.1995). The petitioner can avoid the bar of res judicata by submitting evidence outside the record on appeal that demonstrates that the petitioner could not have raised the claim based on information in the original record. *Id.*

{¶25} However, the evidence submitted with the petition cannot be merely cumulative of or alternative to evidence presented at trial. *State v. Myers*, 12th Dist. Warren No. CA2019-07-074, 2021-Ohio-631, ¶ 17. That is to say, "[r]es judicata bars a petitioner from 're-packaging' evidence or issues that either were or could have been raised in trial or on direct appeal." *State v. Casey*, 12th Dist. Clinton No. CA2017-08-013, 2018-Ohio-2084, ¶ 15.

{¶26} Instead, "'[e]vidence presented outside the record must meet some threshold standard of cogency * * *.'" *State v. Statzer*, 12th Dist. Butler No. CA2017-02-022, 2018-Ohio-363, ¶ 16, quoting *Lawson* at 315. Otherwise, a petitioner could overcome res judicata "'by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery.'" *Lawson* at 315, quoting *State v. Coleman*, 1st Dist. Hamilton No. C-900811, 1993 WL 74756, *7 (Mar. 17, 1993). If the evidence outside the record is only "marginally significant," res judicata still applies to the claim. *State v. Lindsey*, 12th Dist. Brown No. CA2002-02-002, 2003-Ohio-811, ¶ 22, citing *Lawson* at 315.

{¶27} "In reviewing an appeal of postconviction relief proceedings, this court applies an abuse of discretion standard." *State v. Snead*, 12th Dist. Clermont No. CA2014-01-014, 2014-Ohio-2895, ¶ 16. The term "abuse of discretion" implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Thornton*, 12th Dist. Clermont No. CA2012-09-063, 2013-Ohio-2394, ¶ 34; *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 130. "The trial court does not abuse its discretion in dismissing a PCR petition without an evidentiary hearing if (1) the petitioner fails to set forth sufficient operative facts to establish substantive grounds for relief, or (2) the operation of res judicata prohibits the claims made in the petition." *Myers* at ¶ 18.

{¶28} With these principles in mind, we now address Froman's assignments of error. We address certain assignments of error out of the order presented.

### B. Use of the State's Briefing in the Trial Court's Written Decision

{¶29} Assignment of Error No. 2:

{¶30} FROMAN'S RIGHTS AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE TRIAL COURT FAILING TO PROVIDE HIM THE INDEPENDENT, DELIBERATIVE PROCESS TO WHICH HE IS DUE.

{¶31} In a 2018 email correspondence between the trial court judge and the parties' counsel, the judge requested that the parties submit their PCR petition briefings to the court in a Microsoft Word document. The judge explained that, sometimes "I want to restate what has been included in one of the briefs * * * [and] it is easier if I cut and paste those portions."

{¶32} Froman points to various sections of the trial court's 31-page decision denying his PCR petition that were apparently copied and pasted from the state's motion to dismiss. Froman argues that the trial court's use of these excerpts shows that the trial court failed to issue its own decision and instead used a "large portion of the State's analysis" in denying

various grounds for relief. Froman even claims that the trial court's decision was "almost completely derived" from the state's motion to dismiss. He also argues that by copying portions of the state's brief the trial court showed unfairness and presented the image that it was an "advocate" for the state and biased against Froman. Froman suggests that the trial court's decision demonstrates bias. On these bases, Froman argues in Assignment of Error No. 2 that the trial court abused its discretion by denying his "right" under the Eighth and Fourteenth Amendments to the United States Constitution to "an independent, deliberative review."

{¶33} The state, on the other hand, argues that the trial court's decision shows that the court did, in fact, conduct an independent analysis. The state argues that even if the court relied on or "cut and pasted" into its decision certain portions of the state's motion to dismiss, this alone does not prove that the trial court did not engage in an independent analysis or that the court was biased. The state argues that Froman's argument, though not explicitly stated in terms of judicial bias, amounts to an argument that the trial court was biased and that Froman has not overcome the presumption that the trial court acted impartially.

{¶34} It is true that there is a general presumption that a judge is fair and impartial. *State v. Dennison*, 10th Dist. Franklin No. 12AP-718, 2013-Ohio-5535, ¶ 49, citing *In re Disqualification of Kilpatrick*, 47 Ohio St.3d 605, 606 (1989). Froman, as the party alleging a lack of fairness and impartiality, has the burden of bringing forth evidence to overcome that presumption. *Id.*

{¶35} However, "R.C. 2701.03 provides the exclusive means by which a litigant may claim that a common pleas judge is biased and prejudiced." *Vogel v. Felts*, 12th Dist. Clermont No. CA2008-05-051, 2008-Ohio-6569, ¶ 14, *citing Vera v. Yellowrobe*, 10th Dist. Franklin No. 05AP-1081, 2006-Ohio-3911, ¶ 54. "To that end, it is the Ohio Supreme Court,

not this Court, that has the authority to determine whether a [common pleas] judge is biased or prejudiced." *Blair v. Adkins*, 12th Dist. Fayette No. CA2020-10-018, 2021-Ohio-2292, ¶ 9, *citing In re Guardianship of Constable*, 12th Dist. Clermont No. CA97-11-101, 1998 WL 142381, *4 (Mar. 30, 1998) ("'[a] court of appeals is without authority to pass upon the disqualification of a judge'"), quoting *State v. Blankenship*, 115 Ohio App.3d 512, 516 (12th Dist.1996). That said, we may review arguments that a judge's actions violated a defendant's procedural due process rights, and we review Froman's Assignment of Error No. 2 in that way. *See Blair* at ¶ 10.

{¶36} We have reviewed the state's motion to dismiss, the trial court's decision granting the state's motion, and Froman's exhibits identifying the portions of each that Froman claims the trial court copied. We find that Froman has not established that the trial court failed to provide him with an independent, deliberative process. Froman grossly overstates how much the trial court used the state's motion to dismiss in the trial court's decision when he states that the decision was "almost completely derived" from the motion. In fact, while Froman is correct that some passages were copied verbatim, most of the trial court's decision was *not* copied from the state's motion.

{¶37} But we need not describe the exact percentage of the trial court's decision attributable to the state's motion to dismiss. That the court incorporated the state's language in its own decision does not establish that the trial court did not independently deliberate.[3] The court could have simply decided, after a review of arguments by both the state and Froman, that it agreed with the state's position. Froman points to no legal

---

3. Froman argues that "An 'unbiased' opinion should not resemble so closely the arguments drafted by one of the adversaries." Froman cites no authority for this proposition. That is unsurprising, because it is a common, accepted, and ethical practice in the law for judges to refer to and rely on text from other judicial decisions and from documents submitted by the parties. It is only natural that when a party is correct about a point of law or fact, the judge's decision will closely resemble, and perhaps even mimic, the arguments made by that party.

authority that would prevent a court from using one side's legal arguments in drafting a written decision. The court stated in its decision granting the state's motion to dismiss that it conducted the necessary review of all materials submitted with the petition, under R.C. 2953.21(D) and (F). Based on our review of the trial court's decision, we conclude that the trial court engaged in an independent, deliberative process. Froman merely speculates that the trial court did not independently deliberate. We overrule Assignment of Error No. 2.

### C. Claims of Ineffective Assistance During the Guilt Stage of the Trial (Grounds 1-2, 4-13, 22-28, and 44)

{¶38} Assignment of Error No. 3:

{¶39} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED FROMAN'S CLAIMS THAT HIS TRIAL COUNSEL RENDERED CONSTITUTIONALLY DEFICIENT PERFORMANCE IN THE TRIAL PHASE OF HIS CAPITAL TRIAL, WITHOUT ALLOWING FOR AN EVIDENTIARY HEARING, AND IN FAILING TO GRANT RELIEF ON THESE MERITORIOUS IAC CLAIMS.

{¶40} Froman's PCR petition contained 20 grounds for relief (Grounds 1-2, 4-13, 22-28, and 44) related to ineffective assistance of counsel during the guilt stage of his trial. In those grounds for relief, Froman claimed his trial counsel[4] were ineffective by failing to (1) adequately question and challenge allegedly racially biased jurors during voir dire, (2) adequately address issues of negative pretrial publicity, (3) investigate and present expert testimony on the effects of his testosterone use, and (4) effectively cross-examine a state's witness. The trial court denied all these grounds for relief, and Froman argues that such denial was an abuse of the trial court's discretion. We address each argument in turn.

---

4. The word "counsel" can refer to attorneys in the singular or plural. In this opinion, our references to Froman's trial "counsel" are in the plural, as Froman was represented by two attorneys during his trial.

**1. Standard of Review**

**{¶41}** To establish a claim of ineffective assistance of counsel, a petitioner must show that an attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In postconviction proceedings, a petitioner bears the initial burden of submitting evidentiary materials containing sufficient operative facts to demonstrate the lack of competent counsel and prejudice resulting from counsel's ineffectiveness. *State v. Jackson*, 64 Ohio St.2d 107, 111 (1980).

**{¶42}** Under the res judicata doctrine, a trial court may dismiss a postconviction relief petition where a petitioner, represented by new counsel on direct appeal, could have raised the ineffective assistance of trial counsel claim on direct appeal without evidence outside the record. *State v. Lentz*, 70 Ohio St.3d 527 (1994), syllabus; *State v. Loza*, 12th Dist. Butler No. CA96-10-214, 1997 WL 634348, *3 (Oct. 13, 1997). Additionally, mere presentation of evidence outside the record does not transform a claim into one addressable in postconviction. *Myers*, 2021-Ohio-631 at ¶ 95, citing *State v. Drummond*, 7th Dist. Mahoning No. 05 MA 197, 2006-Ohio-7078, ¶ 17. The evidence must show that the petitioner could not have appealed his claim based on the information in the original record. *Id.*

**2. Failure to Challenge Allegedly Racially Biased Jurors (Grounds 7-13, 44)**

**{¶43}** In Ground 7 of his PCR petition, Froman argued that his trial counsel were ineffective "for failing to voir dire individual jurors on racist attitudes." In Grounds 8 through 13, Froman argued that his trial counsel were ineffective for failing to voir dire six specific jurors—that is, Jurors 5, 13, 19, 23, 46, and 49—on "racial bias" or "racial and/or ethnic bias." In Ground 44, Froman argued that his trial counsel were ineffective for failure to challenge jurors for implicit racial bias.

{¶44} In support of these arguments, Froman pointed to certain answers that Jurors 5, 13, 19, 23, 46, and 49 gave to various questions on the long form jury questionnaire. For example, Froman argued that his trial counsel should have explored alleged racial bias held by Juror 49 because she stated in her juror questionnaire responses that she "strong[ly] agree[d]" that "some races and/or ethnic groups tend to be more violent than others," and elaborated, "statistics show that there are more black people commit [sic] crimes. And certain religions have violent beliefs." Froman also pointed out that Juror 49 stated that racial discrimination against black people was "not a problem" and, when asked if she had ever had a "negative or frightening" experience with a person of another race, she described an experience she had with an African-American male who "approach[ed] our training center at night and call[ed] us names and made derogatory remarks."

{¶45} Froman also argues that his trial counsel showed a lack of understanding of implicit bias when, during voir dire, his counsel failed to question jurors about their implicit biases and stated, "I assume none of you people are racist. There is no reason for me to believe that. That would be a totally false impression because there's nothing to indicate that."

{¶46} The trial court dismissed Grounds 7 through 13 and 44. The trial court held that res judicata barred Froman's arguments about the six jurors at issue in Grounds 7 through 13 and about implicit bias in Ground 44 because Froman could have raised those arguments in his direct appeal. Froman appeals, arguing that the trial court abused its discretion.

### a. Res Judicata

{¶47} We agree with the trial court that res judicata barred Grounds 7 through 13 and 44. Froman's claims of ineffective assistance related to alleged racial bias are primarily based on (1) jurors' answers to questions in the long form juror questionnaire and (2)

questions asked (or not asked) by counsel and answers given by jurors during voir dire. The juror questionnaires and the voir dire transcript were within the trial record. Froman therefore could have raised during his direct appeal the very same ineffective assistance arguments he raised in Grounds 7 through 13 and 44 of his PCR petition. *Wagers*, 2012-Ohio-2258 at ¶ 10; *Szefcyk*, 77 Ohio St.3d 93 at syllabus.

**{¶48}** In fact, Froman *did*, on direct appeal, argue that his trial counsel provided ineffective assistance by failing to question or remove Juror 49 based on the very same juror questionnaire answers that Froman pointed to in his PCR petition. The Ohio Supreme Court rejected Froman's argument and held that because Juror 49 promised that she could set her opinions aside and decide the case based on the evidence, Froman's counsel did not provide ineffective assistance and that "the record does not support Froman's argument that [Juror 49] was actually biased against him." *Froman*, 2020-Ohio-4523 at ¶ 57. Because the supreme court has already rejected Froman's ineffective assistance arguments related to Juror 49, we may not reach a different result now, when Froman is attempting to take a second bite at the apple. *See State v. Bethel*, 10th Dist. Franklin No. 07AP-810, 2008-Ohio-2697, ¶ 2 ("We are not at liberty to re-decide any issues that were already decided by the Ohio Supreme Court unless the appellant presents some new evidence or factual information that was unavailable on direct appeal").

**{¶49}** Froman did not argue in his direct appeal that his trial counsel provided ineffective assistance related to Jurors 5, 13, 19, 23, and 46.[5] However, Froman could have

---

5. While Froman did not argue *ineffective assistance* related to Jurors 5, 13, 19, 23, and 46 in his direct appeal, he did argue in his direct appeal that the seating of three of those five jurors—that is, Jurors 5, 13, and 46— violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution. The supreme court analyzed Froman's arguments related to those jurors and concluded, "We do not agree that, as Froman argues, the questionnaire responses of juror Nos. 5, 13, and 46 demonstrate 'blatantly expressed racial views.' The record does not demonstrate that the jurors were unable to be impartial, and Froman has not established that they were actually biased against him." *Froman* at ¶ 61. In reaching this conclusion, the supreme court noted that Froman had omitted from his description of the questionnaire answers given by

brought such arguments in his direct appeal as such arguments rely on information in the trial record. Therefore, res judicata barred Froman's ineffective assistance arguments related to Jurors 5, 13, 19, 23, and 46, just as res judicata barred Froman's ineffective assistance argument as to Juror 49. *Wagers*, 2012-Ohio-2258 at ¶ 10; *Szefcyk*, 77 Ohio St.3d 93 at syllabus. We affirm the trial court as to its denial of Grounds 7 through 13 and 44, and we need not review those grounds further.

### b. Analysis of Evidence Outside the Record

{¶50} Froman tries to circumvent the res judicata bar of his claims of ineffective assistance relating to alleged racial bias by pointing to new documents that he filed with his PCR petition and that were not in the trial record on direct appeal. Those documents were (1) a 2003 article by the American Bar Association ("ABA Guidelines"), titled "Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," stating that defense counsel in capital cases should be aware of racial issues with juries and should question jurors about racial bias, (2) the affidavit of Dr. Jack Glaser, and (3) the expert report of Donald Malarcik. We must determine whether Froman has submitted competent, relevant, and material evidence outside the record to overcome the res judicata bar. *Lawson*, 103 Ohio App.3d at 315.

{¶51} Upon review and for the reasons described below, we find that the extra-record materials that Froman submitted with his PCR petition fail to transform his claims about alleged racial bias of jurors barred by res judicata into those addressable in a

---

those three jurors certain answers that undermined his claim that they were racially biased. For example, the supreme court noted that Juror 13 admitted to being exposed to a person exhibiting "racial, sexual, religious, and/or ethnic prejudice" by explaining he/she had heard "Friends using words that shouldn't be used." *Id.* at ¶ 59. And the supreme court noted that Juror 46 had checked a box indicating that "the issue of racial discrimination against African-Americans in our society" was a "very serious problem." *Id.* Because the supreme court has already rejected Froman's racial bias arguments related to Jurors 5, 13, and 46, we could not re-decide this issue and find that Froman's trial counsel were ineffective in failing to question those jurors further without some new evidence unavailable on direct appeal. *See Bethel* at ¶ 2.

postconviction relief petition.

### i. ABA Guidelines

**{¶52}** Froman argues that his trial counsel failed to address potential racial bias issues in a manner consistent with the ABA Guidelines' recommendations. For example, he points to the ABA Guidelines' statement that the "defense in a capital case is entitled to voir dire to discover those potential jurors poisoned by racial bias, and should do so when appropriate," and argues that his trial counsel did not ask sufficient questions about race during voir dire. The ABA Guidelines were not part of the trial record and Froman submitted the ABA Guidelines for the first time with his PCR petition.

**{¶53}** Froman correctly cites the United States Supreme Court as having stated that when courts analyze claims of ineffective assistance of counsel, they may look to American Bar Association standards "and the like" as demonstrating "prevailing professional norms." *Strickland* 466 U.S. at 688. But Froman's citation undermines his argument. The ABA Guidelines are legal guidance that—just like other materials arguably demonstrating "prevailing professional norms"— any court may consider when reviewing an ineffective assistance of counsel claim. *Id.* As legal guidance, Froman or the state could have cited the ABA Guidelines (which were issued in 2003, long before his direct appeal in 2017) at any time in Froman's direct appeal. Therefore, res judicata barred Froman's arguments concerning the ABA Guidelines. *Wagers*, 2012-Ohio-2258 at ¶ 10; *Szefcyk*, 77 Ohio St.3d 93 at syllabus.

**{¶54}** Froman cannot rely on the ABA Guidelines for another reason. After explaining that ABA guidance materials might establish "prevailing professional norms," the United States Supreme Court cautioned that such published materials "are only guides." *Strickland* at 688. These materials are "only guides" because

No particular set of detailed rules for counsel's conduct can

- 17 -

satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause.

(Citations omitted.) *Id.* at 688-689. Stated otherwise, the ABA Guidelines are not "inexorable commands" with which all capital defense counsel must comply. *Bobby v. Van Hook*, 558 U.S. 4, 8, 130 S.Ct. 13 (2009). Instead, the ABA Guidelines are just that – guidelines purporting to establish a national standard of practice for defense counsel in capital cases. The ABA Guidelines are generic; that is, they are not specific to Froman's case. The ABA Guidelines do not show that any jurors in Froman's case harbored a racial bias against Froman or that Froman's counsel were ineffective in their voir dire of the jury.

**{¶55}** We therefore conclude that the ABA Guidelines are not competent, relevant, and material evidence outside the record that would allow Froman to overcome the res judicata bar as to his arguments about ineffective assistance with respect to potential racial bias. *Lawson,* 103 Ohio App.3d at 315. And we find that the ABA Guidelines are not significant and do not advance Froman's claim beyond a mere hypothesis and a desire for further discovery. *Lindsey*, 2003-Ohio-811 at ¶ 22.

### ii. Dr. Glaser's Affidavit

**{¶56}** Froman submitted an affidavit signed by Dr. Jack Glaser with his PCR petition. Dr. Glaser's affidavit was not part of the trial record on Froman's direct appeal. Froman argues that Dr. Glaser's affidavit establishes that his trial counsel were ineffective in identifying racial bias during voir dire, and that Dr. Glaser could have assisted trial counsel in that task if Froman's counsel had retained him.

**{¶57}** Dr. Glaser stated in his affidavit that he is a social psychologist who

specializes in issues involving stereotyping and prejudice. Dr. Glaser stated that there was a "considerable likelihood" that racial stereotypes influenced the jurors in Froman's case. Dr. Glaser arrived at this conclusion based on his review of the jury questionnaires, and specifically the jurors' responses. Ultimately, Dr. Glaser opined that Froman was not afforded a fair and impartial trial by jury.

{¶58} As for Froman's argument that Dr. Glaser's affidavit establishes that his trial counsel were ineffective in identifying racial bias during voir dire, we conclude that Dr. Glaser's affidavit is deficient in several ways. First, Dr. Glaser did not address the fact that all the seated jurors acknowledged during voir dire that race should not play a role in the decision-making process. Dr. Glaser simply speculates that the allegedly racially biased jurors disregarded their promise to remain fair and impartial and instead decided the case based on racial bias. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 162 (holding that an expert's opinion is admissible so long as it provides evidence of more than mere possibility or speculation). Second, Dr. Glaser's affidavit fails to acknowledge that the court instructed the jurors that they must decide the case only on the evidence presented at trial and simply speculates that the jurors ignored their instructions. This contradicts our duty under Ohio law to presume that jurors followed a court's instructions. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 208. Third, Dr. Glaser's affidavit is simply a repackaging of information in the record concerning alleged racial bias among jurors to promote an argument that we have already determined res judicata bars. Froman may not avoid res judicata by simply submitting an affidavit that repackages information and issues in the record. *See Lawson*, 103 Ohio App.3d at 315; *Casey*, 2018-Ohio-2084 at ¶ 15.

{¶59} We also note the law does not support Froman's reliance on Dr. Glaser's discussion of "implicit bias," or "implicit stereotyping"—that is, the idea that all individuals harbor biases that they do not recognize or acknowledge consciously. Effectively, Froman

cites Dr. Glaser's opinion to suggest that counsel were per se ineffective for not presuming that all jurors are biased and then exposing these biases through interrogation. But there is no basis for such a presumption in the law, and Froman cites none. We reject the notion that defense counsel must conduct voir dire with the presumption that all jurors are biased. Trial counsel is in the best position to determine whether to question any potential juror and to what extent. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 225. "'Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors.'" *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). "'[T]he selection process is more an art than a science, and more about people than about rules.'" *Id.* quoting *Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir.1989). In some cases, asking few or no questions of a prospective juror may be the best tactic for any number of reasons. *Id.* at ¶ 65.

{¶60} Dr. Glaser's opinion is substantively premised upon evidence within the trial record and does not advance Froman's arguments that the jurors in question were racially biased against him. In sum, Dr. Glaser's affidavit is not competent, relevant, and material evidence outside the record that would allow Froman to overcome the res judicata bar as to his arguments about ineffective assistance in discovering potential racial bias in jury selection. *Lawson*, 103 Ohio App.3d at 315. In addition, we find that Dr. Glaser's affidavit is not significant and does not advance Froman's claim beyond a mere hypothesis and a desire for further discovery. *Lindsey*, 2003-Ohio-811 at ¶ 22.

{¶61} To the extent that Froman argues that his trial counsel were ineffective because they failed to consult Dr. Glaser, who could have assisted them as to racial issues during voir dire, the record shows that trial counsel were effective in asking questions intended to identify potential racial bias among jurors.

### iii. Attorney Donald J. Malarcik's Affidavit

**{¶62}** Froman attached the report of a potential expert witness, attorney Donald J. Malarcik, to his PCR petition. Froman makes no argument related to Malarcik's report in his appellate brief. Even so, we have reviewed the report and will analyze whether it advances Froman's ineffective assistance of counsel arguments beyond the res judicata bar.

**{¶63}** In his putative expert report, Malarcik explains that the Ohio Supreme Court certified him to accept capital cases in 1997 and that he has since represented many capital defendants in death penalty cases. Malarcik also states that he has significant experience teaching about the representation of defendants in death penalty cases at legal conferences or seminars. Malarcik opines that Froman's trial counsel were ineffective for failing to question Jurors 5, 13, 46, and 49 concerning racial bias.

**{¶64}** Like Dr. Glaser's affidavit, Malarcik's report simply repackages Froman's arguments related to his trial counsel providing ineffective assistance as to racial bias. *See Lawson*, 103 Ohio App.3d at 315; *Casey*, 2018-Ohio-2084 at ¶ 15. Malarcik's putative expert report is substantively based on matters within the trial record. Malarcik was not present during voir dire and would not be privy to those nuances of juror behavior that might inform counsel. Ultimately, Mr. Malarcik's report is speculative and does not materially advance Froman's ineffective assistance claims.

**{¶65}** We therefore conclude that Malarcik's report is not competent, relevant, and material evidence outside the record that would allow Froman to overcome the res judicata bar related to his arguments about ineffective assistance in pursuing potential racial bias issues during jury selection. *Lawson* at 315. In addition, we find that Malarcik's report is not significant and does not advance Froman's claim beyond a mere hypothesis and a desire for further discovery. *Lindsey*, 2003-Ohio-811 at ¶ 22.

**c. Conclusion Regarding Ineffective Assistance Regarding Alleged Racial Bias**

**{¶66}** For these reasons, the trial court did not abuse its discretion in finding that res judicata barred Froman's arguments in Grounds 7 through 13 and 44. Froman could have raised, and in some cases did raise, those arguments in his direct appeal. And the new documents submitted by Froman with his PCR petition are not significant and do not set forth sufficient operative facts establishing substantive grounds for relief. *Id.*; *Blankenburg*, 2012-Ohio-6175 at ¶ 9.

### 3. Ineffective Assistance Regarding Pretrial Publicity (Grounds 4-6)

**{¶67}** In Ground 4, Froman argues that his "trial counsel were ineffective for failing to adequately support and request their change of venue request for Froman's trial." (Sic.) In Ground 5, Froman argues that "Defense counsel were ineffective for failing to voir dire the jury on the extensive, prejudicial, and racist pretrial publicity that occurred in this case." In Ground 6, Froman argues that "[p]rejudicial pretrial publicity deprived Froman of his fundamental rights to due process and a fair trial." In support of these grounds, Froman argues that media articles described gruesome details of the case and that prosecutors' statements portrayed him through "various racist stereotypes," which statements dehumanized him as "innately savage, animalistic, destructive, and criminal-deserving punishment, maybe death," and played into the stereotypes of "black dishonesty" and the "black brute caricature."

**{¶68}** Froman concedes that his trial counsel moved for a change of venue because of pretrial publicity and submitted to the trial court several news articles showing the type of coverage the case received in the media. But Froman argues that (1) his trial counsel did not effectively voir dire the jurors concerning their awareness of negative pretrial publicity, and (2) his trial counsel were deficient in investigating the media coverage of his case and the impact it had on the jury pool.

{¶69} The trial court dismissed Grounds 4 through 6. The trial court held that res judicata barred Froman's arguments related to pretrial publicity in Grounds 4 through 6 because Froman could have raised those arguments on direct appeal. On appeal, Froman argues that the trial court abused its discretion.

### a. Res Judicata

{¶70} We agree with the trial court that res judicata barred Froman's arguments in Grounds 4 through 6. Froman's claims of ineffective assistance related to pretrial publicity are primarily based on (1) his motion for change of venue and (2) questions asked (or not asked) by counsel and answers given by jurors during voir dire. Froman filed and the court decided the motion for change of venue before trial, and of course the parties and court completed voir dire at the beginning of the trial. Thus, both sources of evidence were in the trial record on direct appeal. Froman therefore could have raised on direct appeal his arguments related to the alleged deficiencies in his counsel's investigation of pretrial publicity and in his motion for change of venue. *Wagers*, 2012-Ohio-2258 at ¶ 10, citing *Szefcyk*, 77 Ohio St.3d 93 at syllabus.

{¶71} Likewise, Froman could have argued on direct appeal that his trial counsel's questioning of potential jurors about pretrial publicity during voir dire was deficient. In fact, as discussed above, Froman did argue in his direct appeal that his counsel's conduct of voir dire was deficient as to issues of racial bias, and he could have made similar arguments about pretrial publicity. Froman simply failed to raise his arguments related to pretrial publicity in his direct appeal. The trial court therefore correctly held that res judicata barred Froman's arguments related to pretrial publicity. *Wagers* at ¶ 10; *Szefcyk* at syllabus.

### b. Analysis of Evidence Outside the Record

{¶72} Froman submitted with his PCR petition many documents related to pretrial publicity that were not part of the trial record. We must examine whether these new

documents presented competent, relevant, and material evidence outside the record that may defeat the application of res judicata. *Lawson*, 103 Ohio App.3d at 315.

{¶73} After a review of the pretrial documents in the trial record and those attached to Froman's PCR petition, we find that the pretrial publicity materials attached to Froman's PCR petition were largely cumulative of the articles that Froman's counsel submitted to the court before trial.

{¶74} Froman submitted three articles with his motion for change of venue. The title of the first article is "Accused I-75 shooter files 93 Warren County Jail complaints." That article described 93 medical complaints and 59 inmate requests made by Froman. The point of the article was that Froman had initiated many more complaints than the average inmate. The second article is titled, "Trial Delayed for I-75 murder suspect Terry Froman." The article described a delay in Froman's trial based on Froman's request for a new lawyer. The article then described allegations concerning Froman's criminal acts, including that he killed Eli, kidnapped Thomas, and shot and killed Thomas after a police chase. A third article, titled "Trial again delayed for man accused in Warren County highway slaying" described a trial delay after the judge granted Froman's request for a new lawyer. The article also discussed Froman's statement that he could not get a fair trial in Warren County because the county was allegedly "racially imbalanced."

{¶75} The new articles submitted along with Froman's PCR petition include articles containing similar reporting on pretrial matters. Several articles describe Froman's trial counsel's demands to have the death-specifications dismissed from his case. An article titled "Accused I-75 shooter gets new attorneys" describes how the trial court continued Froman's trial for a third time after the court granted Froman's request for new lawyers. In fact, Froman included one of the articles submitted with the PCR petition, "Trial Delayed for I-75 murder suspect Terry Froman," with the original motion for change of venue. Another

article titled, "Suspect in Ohio shooting to get new attorney; trial delayed" recounted a trial delay based on Froman's request for a new lawyer. The same article described Froman's claim that he would be denied a fair trial in Warren County due to racial imbalances in the population. Froman included with his PCR petition multiple articles from different news sources that all variously report on his trial delays and continuances and his claim that he could not receive a fair trial.

{¶76} Thus, much of the pretrial publicity documentation presented with Froman's PCR petition was cumulative to what Froman previously submitted with his motion for change of venue. Cumulative evidence of pretrial publicity fails to establish that the outcome at trial would have been different had Froman's counsel submitted the new materials. *See State v. Hicks*, 12th Dist. Butler No. CA2004-07-170, 2005-Ohio-1237, ¶ 12 (affidavits containing evidence cumulative to evidence in the record failed to establish a changed outcome).

{¶77} The record shows that the trial court was aware of the pretrial publicity about Froman's case, and the mere fact that trial counsel failed to submit some published articles about the case in support of Froman's motion for a change of venue does not, by itself, amount to ineffective assistance. *State v. McKnight*, 4th Dist. Vinton No. 07CA665, 2008-Ohio-2435, ¶ 31 ("[C]ounsel's failure to include every piece of publicity surrounding a case does not amount to ineffective assistance of counsel when the trial court is well aware of the level of publicity").

{¶78} Crim.R. 18(B) allows a court to transfer a case to another jurisdiction when it appears that a fair and impartial trial cannot be held in the court in which the action is pending. That said, pretrial publicity, even where that publicity is "pervasive" and "adverse," does not inevitably lead to an unfair trial. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 54.

**{¶79}** The Ohio Supreme Court has said that the best test of whether prejudicial pretrial publicity has prevented a fair and impartial trial is a "'careful and searching voir dire.'" *Id.* at ¶ 55, quoting *State v. Bayless*, 48 Ohio St.2d 73, 98 (1976). Therefore, the supreme court advised that a trial court should make a good-faith effort to seat a jury before granting a motion for a change of venue. *Id.*

**{¶80}** At the same time, in "rare" cases, pretrial publicity is "so damaging" that a court must presume prejudice even without a showing of actual bias. *Id.* at ¶ 56, citing *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507 (1966). To prevail on a claim of presumed prejudice, a defendant must make a "clear" and "manifest" showing that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act. *Id.*

**{¶81}** Upon a full consideration of the "new" pretrial publicity materials that Froman submitted with his PCR petition, we do not find that Froman has made a clear or manifest showing that pretrial publicity was so pervasive or prejudicial that the trial court had to presume prejudice. Nor do we find that the trial court would have granted a change of venue had trial counsel submitted those additional pretrial publicity materials that Froman submitted with his PCR petition.

**{¶82}** As described above, much of the "new" pretrial publicity material submitted with Froman's PCR petition was merely cumulative of the articles already submitted with the motion for change of venue. Those publicity materials in the record covered largely benign topics such as Froman's medical issues, complaints in jail, and continuances of the trial. Much of the actual added content was duplicative, that is, multiple news articles repeating the same factual reporting on pretrial events. None of the reporting we reviewed, either if considered specifically or holistically, would cause us to question whether pretrial media coverage of the case was so pervasive and prejudicial that a court must presume

prejudice. As discussed below, the court and parties did in fact engage the venire in a careful and searching voir dire as to pretrial publicity concerns and managed to impanel a jury.

**{¶83}** Froman also argues that certain media coverage, including comments by prosecutors, indicated that Froman had a history of domestic violence, kidnapping, and stalking. Froman claims these comments "dehumanized" him and played into stereotypes of "black dishonesty" and "black brute caricature." However, in support of this argument, Froman merely cites to a law review article generally discussing what it describes as implicit racial bias in "prosecutorial summations."[6] Froman points to no evidence supporting the contention that any statements by prosecutors in his case depicted him in a racist manner, that any jurors were aware or affected by any allegedly racist comments, or that such alleged comments prevented a fair and impartial jury. The articles cited by Froman consist of statements by prosecutors and news reporting that is factual. Froman does not dispute the accuracy of any of the statements made by prosecutors.

**{¶84}** We therefore conclude that the new pretrial publicity materials Froman submitted with his petition are not competent, relevant, and material evidence outside the record that would allow him to overcome the res judicata bar related to his arguments about ineffective assistance in pursuing a change of venue. *Lawson*, 103 Ohio App.3d at 315. And we find that the new materials are not significant and do not advance Froman's claim beyond a mere hypothesis and a desire for further discovery. *Lindsey*, 2003-Ohio-811 at ¶ 22.

### c. Merits of Froman's Arguments Related to Pretrial Publicity

**{¶85}** Even if res judicata did not bar Froman's pretrial publicity arguments, the

---

6. Praatika Prasad, *Implicit Racial Biases in Prosecutorial Summations: Proposing an Integrated Response*, 86 Fordham L. Rev. 3091, 3103-04 (2018).

record does not support Froman's argument that counsel and the court failed to effectively question jurors about pretrial publicity. Counsel and the court extensively questioned jurors about pretrial publicity during voir dire and the record shows that jurors who acknowledged having been exposed to pretrial publicity about Froman's case were questioned concerning whether they could decide the case impartially. The trial court excused jurors who indicated partiality based on pretrial publicity.

{¶86} For example, the record reflects that Juror No. 35 was observed with a newspaper that contained an article about Froman. The parties extensively questioned the juror about that issue. The court excused Juror 35.

{¶87} Juror 85 stated during voir dire that he had heard about Froman on the radio while he was sitting in traffic. The parties questioned Juror 85 about what he had heard and asked whether he thought he could be impartial given his awareness of the case. He repeatedly assured the parties and court that he could be impartial.

{¶88} The court questioned the prospective jurors as a group and asked whether there was anyone who could not put aside any information that they may have heard about the case and start with a clean state related to the facts and evidence. All jurors agreed that they could put aside what they may have heard and decide the case from a clean slate. Juror 13 stated that he had read an article and had formed an opinion about the case but stated that he could set that opinion aside.

{¶89} In multiple instances in group discussions, unidentified jurors responded affirmatively when asked if they had read something about the case. The court then questioned them as a group and asked whether they could set that information aside, and all agreed that they could.

{¶90} Juror 56 stated that he had heard something about the case before the trial and when asked if he could set that aside and start with a clean slate, the juror responded,

"I don't think I really can."  The court excused Juror 56.

{¶91}  Juror 108 stated that she had seen something about Froman on television but could put it aside for trial purposes.

{¶92}  Juror 98 stated that she had heard something about the case and could not put it aside and had formed an opinion about Froman's guilt or innocence.  The court excused Juror 98.

{¶93}  Juror 107 stated he recalled seeing mention of Froman's case on Twitter but would try his best not to let those things influence him.  The court excused Juror 107.

{¶94}  Juror 113 stated that she had heard or read something about the case and did not think she could set it aside.  The court excused Juror 113.

{¶95}  In other words, the record shows that the court and counsel discussed pretrial publicity throughout the voir dire, and the court either excused or did not seat any jurors who indicated an inability to act impartially based on materials they had seen before trial.  The trial court judge "who sees and hears the juror," has discretion to accept a juror's assurances that he or she would be fair and impartial and would decide the case based on the evidence.  *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 98, quoting *Wainwright v. Witt*, 469 U.S. 412, 426, 105 S.Ct. 844 (1985), citing *State v. Jones*, 91 Ohio St.3d 335, 338 (2001).  Based on the voir dire, the trial court reasonably credited the jurors' assurances and there was no evidence presented of actual bias.  Froman's arguments to the contrary in Grounds 4 through 6 of his PCR petition are simply without merit.

### d. Conclusion on Ineffective Assistance Related to Pretrial Publicity

{¶96}  For all these reasons, the trial court did not abuse its discretion in finding that res judicata barred Froman's arguments in Grounds 4 through 6.  Froman could have raised these arguments on direct appeal.  Additionally, the new evidence about pretrial publicity presented by Froman is not significant and does not set forth sufficient operative facts

establishing substantive grounds for relief. *Lindsey*, 2003-Ohio-811 at ¶*22*; *Blankenburg*, 2012-Ohio-6175 at ¶ 9. Finally, the record does not support Froman's claim that counsel failed to voir dire prospective jurors on pretrial publicity.

### 4. Ineffective Assistance Regarding Expert Testimony on Testosterone Use (Grounds 1-2)

{¶97} Before addressing the trial court's handling of Froman's next set of grounds for relief concerning ineffective assistance, we must provide some background information about the offenses of "aggravated murder" and "murder." The statute defining aggravated murder states, "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." R.C. 2903.01(A). The statute defining murder, on the other hand, states, "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy." R.C. 2903.02(A). The two offenses are almost the same, except aggravated murder requires evidence of another element: "prior calculation and design." R.C. 2903.01(A). Murder is a lesser included offense of aggravated murder. *State v. Haynie*, 12th Dist. Clinton No. CA93-12-039, 1995 WL 55289, *4 (Feb. 13, 1995).

{¶98} In this case, the state charged Froman with aggravated murder, so it had to prove that Froman adopted a plan to kill Thomas. *State v. Coley*, 93 Ohio St.3d 253, 263 (2001).

{¶99} In Ground 1 of his PCR petition, Froman argued that his trial counsel provided ineffective assistance by "fail[ing] to request a lesser included murder instruction and for failure to present supporting expert testimony of lack of prior calculation and design." In Ground 2, Froman argued that his trial counsel provided ineffective assistance by "fail[ing] to request an involuntary intoxication instruction supported by readily available expert testimony."

**{¶100}** In support of these grounds for relief, Froman argued that his trial counsel "failed to retain and/or utilize an expert in pharmacology, such as Dr. Craig Stevens, Ph.D. * * *." Froman submitted Dr. Sevens' putative expert report with his PCR petition. In the report, Dr. Stevens explains how testosterone supplements impact aggression and violence among men. Dr. Stevens also reviews the dates on which pharmacy records show Froman retrieved a prescription for testosterone supplements. Those dates included the day before Froman killed Thomas and her son. Dr. Stevens opines that Froman's "aggression and violence" was due, "at least in part," to increased levels of testosterone in his body.[7]

**{¶101}** The trial court dismissed Grounds 1 and 2. The trial court determined that Dr. Stevens' testimony would not have merited an instruction on the lesser included offense of murder because Ohio does not recognize the defenses of involuntary intoxication or diminished capacity. The trial court also found that res judicata barred Grounds 1 and 2 and that the materials submitted by Froman did not constitute substantive grounds for relief.

**{¶102}** Froman argues in his appellate brief that the trial court abused its discretion because Dr. Stevens would have been able to:

> (1) present affirmative evidence Froman failed to act with prior calculation and design; (2) present affirmative evidence of Froman's involuntary intoxication at the time of the incident; (3) assist with the cross-examination of the State's witnesses and confront the State's case at trial; (4) provide defense counsel the basis to ask for a lesser included murder instruction; and/or (5) provide defense counsel the basis to ask for an involuntary intoxication instruction.

Boiled down, Froman argues that Dr. Stevens would have testified that Froman's murder of Thomas was "a reflection" of the testosterone in his system and not the product of

---

7. In his report, Dr. Stevens did not state that he communicated with Froman and learned that Froman consumed or used the testosterone supplements after filling the prescription and before killing Thomas and Eli. Dr. Stevens simply assumes that Froman used the testosterone supplements in that period. But there is no support for this assumption in the record. Nor did Froman submit an affidavit with his PCR petition stating that he used testosterone supplements during the relevant time.

- 31 -

reasonable thought.

**{¶103}** Froman's argument is essentially that his trial counsel were ineffective for failing to pursue a defense of involuntary intoxication — that he acted under an alleged "roid rage" and that he was incapable of forming the necessary mens rea to support an aggravated murder conviction. The First District faced a similar argument in *State v. Clemons*, 1st Dist. Hamilton No. C-980456, 1999 WL 252655 (April 30, 1999). In that case, the court convicted the defendant of aggravated murder and sentenced him to death, and the Ohio Supreme Court affirmed on direct appeal. *Id.* at *1. The defendant filed a PCR petition and argued that his "trial counsel were ineffective for failing to reasonably investigate a 'Prozac defense' or obtain an expert to present testimony on Prozac in each phase of the trial." *Id.* at *3. The defendant specifically argued that his ingestion of Prozac rendered him involuntarily intoxicated, leaving him incapable of forming the required mens rea. *Id.* at *4. The First District rejected this argument, noting that "Ohio does not recognize a defense of diminished capacity." *Id.* In support, the court cited the Ohio Supreme Court's opinion in *State v. Wilcox*, 70 Ohio St.2d 182 (1982). In *Wilcox*, the supreme court held that a "defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that the defendant lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime." *Id.* at paragraph two of the syllabus. On this basis, and because there was "overwhelming evidence" of the defendant's "murderous intent with prior calculation and design," the First District held that the trial court properly rejected the defendant's argument that trial counsel provided ineffective assistance by not reasonably investigating a "Prozac defense" and by not obtaining an expert to testify about that defense. *Clemons* at *4.

**{¶104}** The Ohio Supreme Court applied the same principle when it stated, in *State v. Taylor*, 98 Ohio St.3d 72, 2002-Ohio-7017, that,

- 32 -

> Except in the mitigation phase, "a defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that, due to mental illness, *intoxication*, or any other reason, he lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime."

(Emphasis added.) *Id.* at ¶ 69, quoting *State v. Cooey*, 46 Ohio St.3d 20, 26 (1989).

{¶105} The Ninth District applied the same principle in a recent case. *State v. Cowell*, 9th Dist. Summit No. 30052, 2022-Ohio-1742. There, the defendant moved to withdraw his guilty plea to aggravated burglary, felonious assault, rape, and kidnapping. *Id.* at ¶ 2-3. The defendant argued that he should be permitted to withdraw his plea because when he made the plea he was unaware of the side effects of Abilify, a drug he was apparently taking at the time of his offenses. *Id.* at ¶ 4, 7. The trial court denied the defendant's motion and the Ninth District affirmed, citing the language from *Taylor* that we cited in the previous paragraph. *Id.* at ¶ 12. The court concluded that,

> Because [the defendant] was previously determined to be sane at the time of the offense, [the defendant] cannot now offer expert psychiatric testimony to prove he lacked the requisite mens rea to commit these crimes or that Abilify caused him to involuntarily kidnap, assault, and rape the victims.

*Id.* at ¶ 12.

{¶106} Froman's ineffective assistance arguments in Grounds 1 and 2 are all based on the argument that his use of testosterone supplements rendered him "involuntarily intoxicated." This is a diminished capacity defense that is not permitted under Ohio law and we find that the trial court properly granted the state's motion to dismiss related to Grounds 1 and 2. *Taylor* at ¶ 69.

{¶107} Even if Grounds 1 and 2 did not fail as a matter of law for the reasons just described, the trial court would still have properly dismissed those grounds because the evidence presented at trial would not support Froman's claim that Thomas' murder was an impulsive act lacking any prior calculation and design. *See Clemons* at *4. Before the

- 33 -

murder, Froman discussed his plans to kill Thomas with his friend, David Clark. In a recorded conversation, Clark tried to persuade Froman to let Thomas go. Froman responded,

> [Froman]: I mean, I know you're trying to talk me down, baby I appreciate it and all. But like I said, I mean it's just not going to happen. It's just not going to happen.
>
> [Clark]: There's still good stuff to live for, Fam.
>
> [Froman]: Man, I already took one life, and I'm about to go ahead and take two [more].

{¶108} In a subsequent phone conversation, Froman informed Clark that police were following him, then he stated, "I'm gonna kill her dude." The facts at trial therefore did not support an instruction on the lesser included offense of murder and the trial court properly dismissed Grounds 1 and 2. *See State v. Hines*, 12th Dist. Clermont No. CA2017-06-025, 2018-Ohio-1780, ¶ 25 (In considering whether an instruction upon a lesser offense should be given, a trial court must first determine whether an offense is a lesser included offense of the crime charged. If the court answers that inquiry affirmatively, then the court must proceed to determine whether the evidence in the case supports an instruction on the lesser included offense).

{¶109} Froman has not shown that his trial counsel provided ineffective assistance by failing to investigate and present evidence about involuntary intoxication by testosterone supplements. We conclude that Dr. Stevens' report is not competent, relevant, and material evidence outside the record that would allow Froman to overcome the res judicata bar related to his arguments about pursuing a testosterone defense or seeking an instruction on a lesser included offense. *Lawson*, 103 Ohio App.3d at 315. And we find that Stevens' report is not significant and does not advance Froman's claim beyond a mere hypothesis and a desire for further discovery. *Lindsey*, 2003-Ohio-811 at ¶ 22. The trial court properly

dismissed Grounds 1 and 2.

### 5. Failure to Effectively Cross-Examine State's Witness (Grounds 22-28)

{¶110} Matthew White, a firearms examiner with the Ohio Bureau of Criminal Investigation, testified at trial as the state's expert witness. White testified about his examination of the gun recovered from Froman's vehicle, a .40-caliber Hi-Point semiautomatic pistol. White determined the gun was operable. White also examined six spent shell casings recovered from the vehicle. White matched the shell casings found in the vehicle to the gun found in the vehicle. Froman's counsel did not object to White's testimony as an expert witness.

{¶111} In Grounds 22-28 of his PCR petition, Froman argued that forensic firearms evidence used to support Froman's conviction was unreliable and that his trial counsel were ineffective for failing to impeach White. The trial court dismissed Grounds 22-28, finding that res judicata barred Froman's arguments. But the trial court also examined the merits of Froman's arguments and found them without merit. Froman now argues that the trial court abused its discretion.

{¶112} On appeal, Froman argues that his trial counsel failed to ask "meaningful" questions on cross-examination that would have "given the jury reason to question the validity of White's testimony." Froman argues that the reliability of expert testimony on ballistics is "questionable" and in support of this argument points to a 2006 report from the National Academy of Sciences' Committee on Identifying the Needs of the Forensic Science Community. Froman submitted this report for the first time with his PCR petition. In the report, the committee made various recommendations for improving the practice of forensic science. The report argued that trial courts should consider two questions in deciding whether to admit forensic evidence: (1) the question of the reliability of the relevant scientific methodology, and (2) the question of the potential for human interpretation tainted by error,

bias, or "the absence of sound operational procedures and robust performance standards."

{¶113} We begin our analysis with the understanding that "[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St. 3d 412, 2006-Ohio-2815, ¶ 101. To fairly judge counsel's performance, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

{¶114} Likewise, "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 66. "[I]t is generally a legitimate trial strategy for defense counsel not to present expert testimony and instead rely upon cross-examination of a state's expert to rebut evidence of a crime." *State v. Green*, 12th Dist. Warren No. CA2017-11-161, 2018-Ohio-3991, ¶ 43. This is because, in many criminal cases, such a decision by trial counsel might uncover evidence that further inculpates the defendant. *See id.*

{¶115} We find that Froman's argument that his trial counsel were ineffective in their cross-examination of White at trial is primarily based on evidence in the trial record. Froman could have argued this issue in his direct appeal. The trial court therefore properly held that res judicata barred Froman's Grounds 22-28. *Wagers*, 2012-Ohio-2258 at ¶ 10; *Szefcyk*, 77 Ohio St.3d 93 at syllabus.

{¶116} We do not find that Froman's submission with his PCR petition of the 2006 National Academy of Sciences committee report transforms Froman's argument from one barred by res judicata into one properly presented in postconviction relief. The report is generic and non-specific to Froman's case. The report does not directly or indirectly undermine the reliability of White's testimony. We therefore conclude that the report is not competent, relevant, and material evidence outside the record that would allow Froman to

overcome the res judicata bar related to his arguments about forensic science. *Lawson*, 103 Ohio App.3d at 315. And we find that report is not significant and does not advance Froman's claim beyond a mere hypothesis and a desire for further discovery. *Lindsey*, 2003-Ohio-811 at ¶ 22.

{¶117} Furthermore, we previously held (in a case in which White testified) that forensic ballistics is an accepted science in Ohio. *State v. Fuell*, 12th Dist. Clermont No. CA2020-02-008, 2021-Ohio-1627, ¶ 50-54. The committee's report merely offers recommendations for improving the field of forensic science, and nothing in the report undermines our previous holding in *Fuell*. Froman does not specify what questions an effective trial counsel would have asked White to give "the jury reason to question the validity" of White's testimony. *See State v. Green*, 12th Dist. Warren No. CA2017-11-161, 2018-Ohio-3991, ¶ 44-45 (rejecting appellant's ineffective assistance argument related to expert testimony, finding that appellant failed to disclose what an expert would have stated at trial or how it would have helped the defense).

{¶118} Even if there was merit to Froman's argument about forensic science, Froman was not prejudiced by White's testimony. White established, as a forensic matter, that Froman shot Thomas, and yet at trial there was no real dispute that Froman shot Thomas. Froman told Clark on the phone that he planned to kill Thomas, and later he told Clark that he had shot Thomas. The responding law enforcement officers personally overheard Thomas' shooting. White's testimony matching shell casings to Froman's gun was thus duplicative of other evidence establishing that Froman shot and killed Thomas. Froman therefore cannot show any reasonable probability of a changed result from a theoretically more effective cross-examination of White. *See Strickland*, 466 U.S. at 694.

{¶119} We find no abuse of discretion in the trial court's decision to apply res judicata to the argument that trial counsel were ineffective as to the cross-examination of Matthew

White. Froman could have raised this argument in a direct appeal. The new evidence presented by Froman is not significant and does not set forth sufficient operative facts establishing substantive grounds for relief. *Lindsey*, 2003-Ohio-811 at ¶ 22; *Blankenburg*, 2012-Ohio-6175 at ¶ 9.

{¶120} Having now completed our analysis of all Froman's arguments related to ineffective assistance of counsel during the guilt phase of his trial, for all these reasons we find that the trial court did not abuse its discretion in denying Grounds 1-2, 4-13, 22-28, and 44. We overrule Froman's third assignment of error.

### D. Claims of an Allegedly Racially Biased Jury (Grounds 14 and 45)

{¶121} Assignment of Error No. 4:

{¶122} THE IMPANELING [sic] OF A RACIALLY BIASED JURY IS STRUCTURAL ERROR. FROMAN ESTABLISHED THAT HIS JURY WAS COMPRISED OF RACIALLY BIASED JURORS AND THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GRANT FROMAN RELIEF ON THESE GROUNDS.

{¶123} Referring to his third assignment of error, Froman argues that the court denied him a fair trial because racially biased individuals were empaneled on his jury, that this was structural error, and prejudice must be presumed. For the reasons set forth in our response to the third assignment of error, res judicata bars Froman's claim that racially biased jurors convicted him. Froman could and did raise claims related to racially biased jurors in his direct appeal to the Ohio Supreme Court. *Froman*, 2020-Ohio-4523, ¶ 53, 58. The supreme court rejected these claims. For the same reasons discussed in response to the third assignment of error, the extra-record materials about alleged racial bias that Froman submitted with his PCR petition are not significant and do not advance Froman's claim beyond the bar of res judicata. *Lindsey*, 2003-Ohio-811 at ¶ 22; *Myers*, 2021-Ohio-631 at ¶ 17. We therefore overrule Froman's fourth assignment of error.

### E. Claims of Ineffective Assistance During the Penalty Phase
### (Grounds 3, 16-21, 36-43, 46, and 47)

{¶124} Assignment of Error No. 5:

{¶125} THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED FROMAN DUE PROCESS, WHEN IT SUMMARILY DISMISSED HIS CLAIMS THAT HIS TRIAL COUNSEL RENDERED CONSTITUTIONALLY DEFICIENT PERFORMANCE DURING THE MITIGATION PHASE OF HIS CAPITAL TRIAL, AND IN FAILING TO GRANT RELIEF ON THE MERITORIOUS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS.

{¶126} Assignment of Error No. 5 concerns the penalty phase of the trial and Froman's claim that his counsel provided ineffective assistance in presenting a mitigation case. In support of his PCR petition, Froman identified two groups of putative mitigation witnesses: (1) fourteen lay witnesses, and (2) three putative expert witnesses. We will address these groups separately.

### 1. Grounds for Relief Concerning Lay Witnesses
### (Grounds 16-21, 36-43, and 47)

{¶127} In his PCR petition, Froman argued in Grounds 16-21, 36-43, and 47 that his trial counsel provided ineffective assistance in the penalty phase of his trial by failing to investigate and present certain lay witnesses, including various relatives, friends, co-workers, and past acquaintances.

{¶128} More specifically, in Grounds 16-21, Froman argued that his trial counsel provided ineffective assistance for failing to "investigate" and present the following mitigation witnesses: Harry Lynn, Jr.; Delores Nance; Dawn Attebury; Andrea Jerome; Doug Van Fleet; Steven Dreher. In Grounds 36-43, Froman argued that his trial counsel provided ineffective assistance by failing to "fully investigate"[8] and present the following

---

8. Froman never explained why Grounds 16-21 concerned the alleged failure to "investigate" some lay witnesses, while Grounds 36-43 concerned the failure to "fully investigate" other lay witnesses.

mitigation witnesses: Alexis Froman; Alissa Jones; Anna Wilson Merriweather; Glenda Dunbar Dinkins; Dr. Jermaine Ali, M.D.; Kim Froman; Margaret Smith; and Rev. Charles Dunbar. Froman submitted affidavits signed by all fourteen of these individuals with his PCR petition. In Ground 47, Froman argued that his trial counsel provided ineffective assistance by "failure to present compelling mitigation information about Froman's unique background, health, and the racial dynamics he faced."

{¶129} The trial court granted the state's motion to dismiss these grounds for relief, finding them barred by res judicata. The trial court also found that the exhibits Froman submitted in support of his penalty phase arguments did not meet the threshold level of cogency to avoid the res judicata bar and that there was no substantive merit to Froman's arguments. Froman argues that the trial court abused its discretion.

{¶130} We agree with Froman that because he relied on affidavits outside the record in support of Grounds 16-21, 36-43, and 47 in his PCR petition, and because Froman could not have raised his arguments with respect to those affidavits in his direct appeal, res judicata did not bar those arguments. *See State v. Fry*, 9th Dist. Summit No. 26121, 2012-Ohio-2602, ¶ 38-39 (holding that denial of PCR argument was error because PCR petitioner relied on affidavit presenting "evidence outside of the record," the petitioner's claim "could not have been fairly determined on direct appeal"); *Lawson* at 315. Thus, we agree the trial court erred to the extent it found that res judicata barred Grounds 16-21, 36-43, and 47. That said, we need not remand for the trial court to consider the evidence presented as it relates to this claim because the trial court already determined that the affidavits relied on by Froman in his PCR petition were not significant, or were only marginally significant, to his claims. *See State v. Ruggles*, 12th Dist. No. CA2021-03-023, 2022-Ohio-1804, ¶ 64.

{¶131} We will therefore analyze the merits of Froman's arguments related to Grounds 16-21, 36-43, and 47. But we will first describe trial counsel's obligations with

respect to mitigation in a capital case, the information the record reveals about the scope of trial counsel's investigation into potential mitigation evidence and witnesses, and the mitigating evidence that counsel offered at trial.

### a. Applicable Law: Investigation and Presentation of Mitigation Evidence

{¶132} "In a capital case, '[d]efense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability, and family relationships.'" *Myers*, 2021-Ohio-631 at ¶ 134, quoting, *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 219. "Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*, citing *State v. Johnson*, 24 Ohio St. 3d 87, 89 (1986). Counsel's mitigation investigation should include efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence. *Id.*, citing *Wiggins* at 524.

{¶133} "Given the severity of the potential sentence and the reality that the life of a capital defendant is at stake, it is only after a full investigation of all the mitigating circumstances that counsel can make an informed, tactical decision about which information would be most helpful to the client's case." *Id.* citing *State v. Johnson*, 24 Ohio St.3d 87, 90 (1986). "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]'" *Id.* quoting *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir.1994). "However, a failure to investigate, especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted.'" *Id.* "An attorney's failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel." *Pickens* at ¶ 219.

{¶134} That said, the law is well settled that counsel's strategic decisions related to mitigation do not constitute ineffective assistance of counsel. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 288. "The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith*, 79 Ohio St.3d 514, 536 (1997). Moreover, "'[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.'" *State v. Murphy*, 91 Ohio St.3d 516, 542 (2001), quoting *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir.1993). "[A] petition for postconviction relief does not provide the defendant with a second opportunity to litigate his conviction, nor does the submission of a new expert opinion containing a theory of mitigation different from the one presented at trial show ineffective assistance of counsel." *State v. Murphy*, 10th Dist. Franklin No. 00AP-233, 2000 WL 1877526, *5 (Dec. 26, 2000).

**b. Froman's Trial Counsel's Investigation and Presentation of Mitigation Evidence**

{¶135} Froman did not submit with his PCR petition any affidavits signed by his trial counsel explaining the steps they took or did not take to investigate potential mitigating evidence. *See generally Myers*, 2021-Ohio-631 at ¶ 137 (explaining that PCR petitioner submitted affidavit of trial counsel admitting steps counsel did not take in mitigation investigation). This is not to say that we know nothing about the scope of Froman's trial counsel's investigation. On the contrary, the trial record reveals much about the steps that Froman's trial counsel took to investigate potential mitigating evidence. For example, the record shows that Froman's trial counsel retained a mitigation specialist to assist them at trial, that Froman had three experts appointed to him at various stages of the case, and that trial counsel had access to Froman's medical, school, and jail records. Furthermore, Froman's counsel engaged in at least some investigation of witnesses who could provide information about Froman's history, character, and background; we know this because trial counsel identified several such witnesses. The trial court also found in its decision that

- 42 -

Froman's counsel were in contact with the mitigation specialist in Froman's separate capital prosecution case in Kentucky for Eli's murder. And as we will discuss below, the trial record and affidavits submitted with the PCR petition reflect that trial counsel interviewed Froman's two daughters and his mother as to potential mitigating evidence.

{¶136} During the penalty phase of the trial, Froman's trial counsel called and elicited testimony from Froman's daughter and a clinical psychologist. Trial counsel also permitted Froman to read an unsworn statement to the jury. We will summarize what each had to say.

{¶137} First, Alexis Froman, who is Froman's younger daughter, testified about the positive experiences she had with her father while growing up. She testified that she loves him and that he was a "big part" of her life. She also testified that Froman was a good worker. She said that before September 12, 2014, her father had become more distant and sometimes he would lose his "train of thought." Alexis directly addressed her Father's murders of Thomas and Eli, stating that what her father did that day was not the father she knew. Alexis asked the jury to spare her father from death because he was a positive person in her life, and she needed him around for "motivation" and "encouragement."

{¶138} Second, expert witness Dr. Nancy Schmidtgoessling, a clinical psychologist, testified that she had interviewed Froman for around seven hours over two days. She questioned Froman to learn more about his background, including where he grew up, what he did in his life, his family, his schooling, his work experiences, and his psychological functioning. She recounted Froman's answers for the jury.

{¶139} Dr. Schmidtgoessling reported that Froman told her that his mother raised him and that he had five siblings. As a child, he was not close to anyone. He felt his mother was too strict; she hit him and called him names. His father "really wasn't that available."

{¶140} Early in his life, Froman learned to stay to himself emotionally. His IQ, 86,

was below average, but he completed high school, and his IQ was sufficient to allow him to manage his life. Froman had multiple jobs and loved to work. He mainly worked jobs in the restaurant industry.

{¶141} Dr. Schmidtgoessling explained that along with asking Froman questions about his life, she conducted two tests. The first, a "personality assessment inventory" (PAI), surveyed a wide variety of disorders. The PAI test showed that Froman had symptoms of depression. The second test, the "OMNI" test, measures personality. The OMNI test revealed that Froman was a person who tends to be unhappy and pessimistic.

{¶142} Dr. Schmidtgoessling testified that Froman's depression did not rise to the level of impairing his ability to function. However, she concluded that when an episode of major depression superimposed itself upon his underlying depression, such an event would impact his ability to function.

{¶143} Froman reported to Dr. Schmidtgoessling that he and Thomas had been together around four years at the time of her murder. He told Dr. Schmidtgoessling that his relationship with Thomas was "very special" to him and that Thomas was "perfect." They had talked about marriage and having a child. Froman told Dr. Schmidtgoessling that he believed that Thomas was seeing other men. He claimed to have found evidence on Thomas' phone that she was communicating with other men about sexual matters. Froman also told Dr. Schmidtgoessling that Thomas' failure to account for money he gave to her angered him.

{¶144} Dr. Schmidtgoessling opined that Froman was suffering from a moderate underlying depression in 2014 but that a major depressive disorder occurred from two stressors in his life before the murders: the loss of his relationship with Thomas, and the loss of his employment. Dr. Schmidtgoessling further opined that due to Froman's emotional detachment, such stressors affected him more than they would have a different

person.

**{¶145}** Third, while he did not testify, Froman read an unsworn statement during the penalty hearing. In it, he repeatedly apologized and took the blame for what he did, stating, "I totally accept responsibility for what happened on September 12, 2014." He also stated that "everything that happened was my fault." But he also blamed Thomas for taking his money and not being "nice" to him and said that he found out that she was sending "naked pictures" of herself to other men, which made him sick and unhappy.

**{¶146}** Having reviewed the mitigation evidence submitted or elicited by Froman's trial counsel, we conclude that the state accurately summarized Froman's trial counsel's mitigation strategy as follows:

> * * * [Froman's trial counsel's] strategy in the sentencing phase was to emphasize Froman's good qualities. Through the testimony they elicited, they tried to portray Froman as:
>
> •      A good father and son, whom his daughter and his mother needed in their life, both mentally and financially;
>
> •      A hard worker, who had tried to rise above his low IQ and mental shortcomings;
>
> •      A person who accepted responsibility and had great remorse for what he had done; and
>
> •      A person who was typically strong but who, at the time of the murders, was struggling mentally and emotionally because of the loss of employment and the loss of his relationship with Ms. Thomas.

#### c. Analysis of Alleged Failure to Investigate Lay Witnesses

**{¶147}** As described above, Froman's trial counsel *did* undertake an investigation of potential mitigation evidence. Froman's argument related to Grounds 16-21, 36-43, and 47 is not that his trial counsel completely failed to investigate mitigation evidence, but that he failed to investigate as to the fourteen lay witnesses identified by Froman in his PCR

petition. Froman refers to his trial counsel's investigation of potential lay witnesses as "unreasonably truncated."

{¶148} But the affidavits that Froman submitted with his PCR petition do not show that trial counsel's investigation was "unreasonably truncated." In her affidavit, Alexis states that "I testified at trial but the attorneys never asked me about most of the information here [in her affidavit]. They only asked me very basic questions, which I answered. I would have told them all of this had they shown any real interest in what I had to say." It is unclear from this statement whether Alexis contends that Froman's trial counsel failed to ask her about the topics covered in her affidavit at trial or failed to ask her about those topics when they spoke to her before trial. But even if we assume that she meant that trial counsel "only asked me very basic questions" before trial and failed to "show any real interest in what I had to say" before trial, Alexis leaves the question of what trial counsel did and did not ask her to the imagination.

{¶149} Next, Alissa Jones, who is Froman's older daughter, states in her affidavit that "I spoke to one of my dad's lawyers, a woman, years ago, about testifying at my dad's trial." She states that she told the lawyer that she was "worried about testifying in a way that would hurt my dad because I love him," and that the attorney never followed up with her about testifying. Alissa, like Alexis, does not describe the scope or content of Froman's trial counsel's questioning about the topics raised in her affidavit.

{¶150} The same is true with Kim Froman. Kim states in her affidavit that "I talked to [Froman's] lawyers at a deposition before his sentencing hearing in Ohio." She complains that they did not ask "a lot of specific questions about my life or [Froman]," but she admits that she "remember[s] that they said they would try to help me get up to Ohio for [Froman's] case because I didn't have a lot of money or a good car." Either trial counsel helped Kim travel to Ohio or Kim found her own way to travel to Ohio, because Kim also states that she

came to Ohio for "one night of the trial." Kim complains that Froman's counsel "never asked me to testify" after she arrived in Ohio. While Kim states her opinion that trial counsel did not ask "a lot of specific questions about my life or [Froman]," she does not provide any details about the scope or content of trial counsel's questioning.[9]

{¶151} The remaining eleven lay witnesses proposed by Froman—that is, Harry Lynn, Jr.; Delores Nance; Dawn Attebury; Andrea Jerome; Doug Van Fleet; Steven Dreher; Anna Wilson Merriweather; Glenda Dunbar Dinkins; Dr. Jermaine Ali, M.D.; Margaret Smith; and Rev. Charles Dunbar—all state in their affidavits that Froman's trial counsel did not contact them before trial or state nothing about contact with trial counsel. But Froman has provided no affidavits explaining whether Froman's counsel may have learned of those witnesses and the knowledge they may have possessed by other means. The mere fact that trial counsel did not question a potential lay witness is insufficient to prove that trial counsel did not satisfy trial counsel's obligation to investigate.

{¶152} We explained above that "[i]n a capital case, '[d]efense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability, and family relationships.'" *Myers*, 2021-Ohio-631 at ¶ 134, quoting *Pickens*, 2014-Ohio-5445 at ¶ 219. This duty does not require that trial counsel interview *every* individual who may have knowledge of the "defendant's background, education, employment record, mental and emotional stability, and family relationships." A requirement that trial counsel interview every such individual could never be satisfied. As an example, if the law required trial counsel to interview every individual

---

9. While we recognize that Froman's argument is that trial counsel's mitigation investigation is "truncated," we still emphasize that each of Alexis, Alissa, and Kim's affidavits show that trial counsel *did* investigate all three women as potential mitigation witnesses. The affidavits simply do not describe the extent of this investigation.

with knowledge of a capital defendant's "employment record," counsel would be required to interview every manager, every coworker, and potentially every client and customer who ever worked with the defendant at any of the defendant's previous places of employment. The unreasonableness of such a requirement is apparent. Therefore, the law requires, instead, that trial counsel meet the less specific, more general obligation of "investigat[ing] the circumstances of his client's case and explor[ing] all matters relevant to the merits of the case and the penalty* * *." *Id.* "In a petition for post-conviction relief, which asserts the ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." *Jackson*, 64 Ohio St. 2d 107, at syllabus. Froman did not meet his burden as to the remaining eleven lay witnesses.

{¶153} Because the record, as supplemented by the affidavits attached to Froman's PCR petition, is unclear on the scope of questioning and preparation that trial counsel engaged in with the fourteen lay witnesses at issue, we cannot find a failure to investigate as to those lay witnesses. *See Thompson*, 2014-Ohio-4751 at ¶ 247 ("[w]here the record on appeal does not indicate the extent of counsel's pretrial investigation, an appellate court will not infer a defense failure to investigate from a silent record").[10]

#### d. Analysis of Alleged Failure to Present Mitigation Evidence

{¶154} Froman also argues that his trial counsel were ineffective during the penalty phase in failing to present the testimony of the fourteen lay witnesses identified above. Froman points to the content of the fourteen witnesses' affidavits in support of his argument.

---

10. Though unnecessary to our analysis, we note that the testimony offered by Alexis and Dr. Schmidtgoessling addressed aspects of Froman's background, education, employment record, mental and emotional stability, and family relationships—all topics that trial counsel had an obligation to investigate.

{¶155} For purposes of demonstrating ineffective assistance, the Ohio Supreme Court has advised that a petitioner must establish operative facts of deficient performance and prejudice. *State v. Kapper*, 5 Ohio St.3d 36, 38 (1983). To establish deficient performance, Froman's petition must include evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel. *Jackson*, 64 Ohio St.2d 107 at syllabus. To establish prejudice, Froman must support his petition with sufficient operative facts to demonstrate a reasonable probability that the new mitigation evidence would have swayed the jury to impose a life sentence. *Keith*, 79 Ohio St.3d at 536.

### i. Analysis of Deficient Performance

{¶156} During her penalty phase testimony, trial counsel elicited testimony from Alexis Froman that supported trial counsel's strategy of depicting Froman as a good father and son, whom his daughter needed in her life. Her testimony also supported trial counsel's strategy of depicting Froman as a hard worker who had been acting differently in the time leading up to the murders. Alexis emphasized that Froman's behavior deviated from his past behavior, further supporting trial counsel's strategy. In Alexis' affidavit submitted with Froman's PCR petition, Alexis fleshes out and expands on her trial testimony by saying more about mental health and substance abuse issues in her family, mentally and physically abusive behavior by Froman's mother and other family members, as well as her own mental health issues. She discusses positive aspects of her father and states that Froman liked to work, and always had a job. She explains that Froman struggled to find work after he won a lawsuit against his former employer. She also states that her father loved Thomas very much and that she felt like Froman, Thomas, Alexis, Eli, and Thomas' other son formed a family. In other words, Alexis' affidavit both deepens her previous trial testimony and adds testimony that supports Froman's new mitigation theories asserted in his PCR petition.

{¶157} We have also closely reviewed the remaining thirteen lay witness affidavits

submitted with Froman's petition. The subjects covered include Froman's childhood and adolescence, Froman's family, Froman's mother's alleged abuse of him, Froman's mental health, substance abuse in Froman's family, and instances of racism experienced by Froman or generally experienced by Black people in the area where Froman grew up.

{¶158} In other words, the fourteen witnesses' affidavits all contain content intended to either expand on trial counsel's mitigation strategy or to support new mitigation strategies asserted by Froman in his PCR petition, such as emphasizing the effects of a bad childhood and racism on Froman's life. But "[i]t is well established that a 'defense decision to call or not call a mitigation witness is a matter of trial strategy * * * Debatable trial tactics generally do not constitute ineffective assistance of counsel.'" *Myers*, 2021-Ohio-631 at ¶ 125, quoting *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 19.

{¶159} While the lay witness affidavits may paint a more complete picture of Froman as a person, the content of those affidavits is not significant in terms of mitigating Froman's conduct. That Froman faced racism at times during his life is of course condemnable. It is also unfortunate that Froman came from a dysfunctional family. But there is no evidence that these issues in Froman's past had anything to do with or mitigated Thomas' aggravated murder.

{¶160} Additionally, if defense counsel chose not to present the jurors with evidence about racism or Froman's dysfunctional family, then such a decision would be within the ambit of reasonable trial strategy. *Keith*, 79 Ohio St.3d at 530, quoting *State v. Johnson*, 24 Ohio St.3d 87, 91 (1986) ("It is conceivable that the omission of such evidence in an appropriate case could be in response to the demands of the accused or the result of a tactical, informed decision by counsel, completely consonant with his duties to represent the accused effectively"). Counsel could have determined that a strategy that emphasized these issues might appear to jurors like trying to shift blame away from Froman for Thomas'

brutal slaying. In sum, the affidavits submitted by Froman do not provide sufficient operative facts to demonstrate the lack of competent counsel. *Jackson*, 64 Ohio St.2d 107 at syllabus.

### ii. Analysis of Prejudice

{¶161} In addition, even if Froman had demonstrated deficient performance by his trial counsel during the penalty phase of his trial, we do not find that Froman has demonstrated prejudice.

{¶162} The jury found Froman guilty of two aggravating factors that permitted imposing the death penalty. The first aggravating factor was that Thomas' murder was part of a course of conduct that involved the purposeful killing of two or more people. R.C. 2929.04(A)(5). The second aggravating factor was that Froman murdered Thomas while he was committing a kidnapping offense. R.C. 2929.04(A)(7).

{¶163} Evidence at trial support these factors. Froman, armed with a gun, entered Thomas' home at around 5:00 a.m. He went into Thomas' bedroom and forced her out of bed. Thomas started screaming for her son. Eli, dressed only in boxer shorts, woke, and came to help his mother. Froman shot Eli in the abdomen, the arm, and the back of the head. After killing her son in front of her, Froman forced Thomas out of the home and into his vehicle.

{¶164} Froman then drove away with Thomas as his hostage. The evidence showed that at some time during the kidnapping, Froman severely beat Thomas. She suffered blunt force trauma to her torso, inner thighs, and extremities, a laceration on her upper lip, three lacerations on the top of her head, and abrasions on her forehead and right cheek. She had a broken jaw and one of her lower teeth had been knocked out. She had defensive wounds, including chipped nails and a nail ripped off.

{¶165} The evidence showed that Froman stopped at a gas station sometime during

the kidnapping. On video security footage, Froman gets out of his vehicle and walks into the gas station. It was daytime and the gas station was full of people. Thomas, completely nude, exited the vehicle and began to run away. However, Froman saw her, rushed outside, grabbed her by her hair, and then dragged her back to the vehicle. He threw her into the backseat and drove away.

{¶166} While Froman was driving on the highway, he discussed what he had done with his friend, David Clark. Clark tried to convince him to give up and allow Thomas to live. But Froman was resolute that he planned to kill Thomas. Eventually, he did so by shooting her four times, once in the stomach, once in the breast, once in her upper chest, and then once, like her son, in the back of her head.

{¶167} Froman did not kill Thomas because he was suffering from mental illness. Froman did not kill Thomas because of his dysfunctional family or an abusive mother. Froman did not kill Thomas because of incidents of racism he endured. Froman killed Thomas because he was angry that she broke up with him and he killed Eli because Eli got in his way.

{¶168} In fact, there was evidence at trial that Froman began engaging in stalking-type behavior the day after Thomas ended their relationship. He appeared at Thomas' workplace and told Thomas' boss that "Kim has made me lose everything, now I will make her lose everything no matter the cost." He kept that promise. The aggravating evidence here far outweighs any evidence Froman submitted with his PCR petition.

{¶169} For the foregoing reasons, we do not find that there exists a reasonable probability that a juror would have recommended a life sentence had Froman's counsel presented the testimony of the lay witnesses newly identified in Froman's PCR petition. *Keith*, 79 Ohio St.3d at 536. The trial court did not abuse its discretion in granting the state's motion to dismiss as to Grounds 16-21, 36-43, and 47. *Blankenburg* at ¶ 9 ("The decision

to grant or deny an evidentiary hearing [for a PCR petition] is left to the sound discretion of the trial court").

### 2. Grounds for Relief Concerning Putative Expert Witnesses (Grounds 3 and 46)

{¶170} In Ground 3, Froman argued that his trial counsel provided ineffective assistance "for failing to investigate and present expert pharmacological testimony" in the penalty phase. In Ground 46, Froman argued that his trial counsel provided ineffective assistance by "failure to present compelling psychological testimony." In support of his arguments in these grounds for relief Froman submitted the putative expert reports of Celeste Henery, Ph.D. and Daniel Grant, Ed.D, as well as the previously discussed report of Dr. Stevens. Because we have already summarized Dr. Stevens' report, we will only summarize Dr. Henery's report and Dr. Grant's report here.

{¶171} Dr. Henery's putative expert report says that she is a cultural anthropologist. She met with and interviewed Froman for five and one-half hours. She also reviewed the lay person affidavits described above. In Dr. Henery's opinion, Froman spent his life minimizing the ramifications of a volatile childhood. Dr. Henery believes that Froman, because of an inability to communicate, relied on self-sufficiency and a job to overcome stereotypes and maintain a stable economic life. She believes that Froman sought out interracial romantic relationships and that his struggles in those relationships were his greatest challenge. His emotional decline, most pronounced in the summer of 2014, suggests to Dr. Henery that Froman was under tremendous pressure due to unemployment, homelessness, failing health, and emotional alienation. Dr. Henery believes that Froman's issues at that time were "cross-cut" by racial dynamics. Dr. Henery further reports that Froman did not have the understanding to seek professional help.

{¶172} Dr. Grant's putative expert report says that he is a neuropsychologist and that he met with Froman in prison. Froman told Dr. Grant that his mother hit him and would call

him names like "dumb" and make other negative comments about him. Dr. Grant opines that Froman has difficulty using language to solve problems. Dr. Grant also opines that abuse by Froman's mother during Froman's childhood was a factor in shaping his relationships and that the same abuse contributed to episodic outbursts and difficulty controlling his temper. Dr. Grant states that Froman maintained a low level of depression throughout his life and that when Froman experienced distress, self-doubts, and rejection, his depression would likely spike to the level of a major depressive disorder. Dr. Grant suggests that Froman's depression may have "spiked" to a "major depressive disorder" that contributed to his killing Thomas. Referring to Dr. Stevens' report on Froman's use of testosterone, Dr. Grant also opines that it was "possible" that testosterone injections contributed to Froman's loss of control "in the rapidly evolving, emotionally charged situation with the victim [that is, Thomas]."

{¶173} In *Myers,* 2021-Ohio-631, we reversed a trial court's denial of a PCR petition and ordered the trial court to conduct an evidentiary hearing on claims of ineffective assistance of counsel concerning the failure to present expert testimony during the mitigation stage of a capital case. *Id.* at ¶ 148. There, Myers, who was nineteen years old when he committed a murder, claimed his counsel were ineffective for failing to present any expert testimony, and specifically for failing to present expert testimony relating to (1) adolescent brain development, (2) that he suffered from bipolar disorder causing increased impulsivity, and (3) that he was not fully neurologically developed at the time of the offense. *Id.* at ¶ 132, 135, 136. Myers included the affidavit of his lead counsel, who stated, "I did not consider requesting funding for, or hiring, a youth/adolescent expert to help explain issues, including youth/adolescent brain development, to the jury." *Id.* at ¶ 137. Furthermore, the lead counsel claimed that he had retained a psychologist for mitigation, but that she had informed him that her testimony would not be helpful and would be

cumulative to other testimony. *Id.*

{¶174} But the psychologist contradicted lead counsel's assertion. In an affidavit, she asserted that she provided Myers' lead counsel with a report that included her opinion about the effects of Myer's age as a strong mitigating factor and that she was prepared to testify to this at trial. *Id.* at ¶ 138. This court found that the lead counsel's assertion that he did not consider hiring a youth/adolescent expert indicated that his decision was not an informed tactical decision. *Id.* at ¶ 142. We thus held that Myers had set forth sufficient operative facts to warrant an evidentiary hearing on his PCR petition. *Id.* at ¶ 140.

{¶175} Froman's case is distinguishable from *Myers*. First, there was no expert mitigation testimony presented in *Myers*, while here, Dr. Schmidtgoessling presented her opinion about the mitigating effects of a major depressive disorder that Froman underwent at the time of the offense. Second, the mitigating factor of youth and the neurological effects of not having a fully developed brain appear to be stronger factors in mitigation than the proposed expert testimonies of Dr. Henery, Dr. Grant, and Dr. Stevens. As compared to adults, juveniles lack maturity, have a less developed sense of responsibility, are more vulnerable to negative influences, and their characters are not well formed. *See Graham v. Florida*, 560 U.S. 48, 68, 130 S.Ct. 2011 (2010). Juveniles are also more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults. *Graham* at 68, quoting *Roper* at 570.

{¶176} The report of Dr. Henery sets forth sociological or cultural mitigation information, but courts have rejected claims that failure to use this type of evidence constitutes ineffective assistance. *State v. Murphy*, 10th Dist. Franklin No. 00AP-233, 2000 WL 1877526, *6 (Dec. 26, 2000) ("[e]ncouraging jurors to decide a defendant's sentence based on conclusions about groups of people, delineated by race or ethnicity, is [an] anathema to individualized sentencing. Sentencing in capital cases should be about the

crime and the individual characteristics of the defendant").  Accord *State v. McKnight*, 4th Dist. Vinton No. 07CA665, 2008-Ohio-2435, at ¶ 101-103; *State v. Issa*, 1st Dist. Hamilton No. C-000793, 2001 WL 1635592, at *4.  In addition, Dr. Henery's report simply does not meaningfully mitigate Froman's actions on September 12, 2014.  Dr. Henery suggests that it is important to understand Froman's dysfunctional life to put into "context" what he did on September 12, 2014.  However, Froman's background is ultimately irrelevant here because, as stated above, the evidence was clear that Froman killed Thomas due to anger – not because of a poor upbringing or because he was a Black man who suffered racism.  Dr. Henery's report does not set forth sufficient operative facts to establish substantive grounds for relief.  *Blankenburg*, 2012-Ohio-6175 at ¶ 9.

{¶177} Dr. Grant's report goes into detail about Froman's background and opines that depression could have contributed to Froman's actions when he killed Thomas.  But there is nothing in Dr. Grant's reports that suggests that immaturity or a less-than-developed brain mitigated Froman's actions.  Rather, as is clear from the evidence, Froman's actions appeared well-planned and fueled by anger and rage.  Dr. Grant's report is speculative as to the causes that contributed to Froman's actions on September 12, 2014.  Dr. Grant's report does not set forth sufficient operative facts in support of Froman's petition.  *Id.*

{¶178} Regarding testosterone, Dr. Grant's report references Dr. Stevens' report and suggests that testosterone "could" have contributed to Froman's actions that day.  In this regard, Froman contends that his trial counsel was ineffective for failing to retain Dr. Stevens to consult with Dr. Schmidtgoessling and provide her with information to "better assist the jury in understanding her findings."  Froman refers to Dr. Schmidtgoessling's testimony that Froman was suffering from depression and stressors.  Froman contends that Dr. Steven's opinion concerning testosterone would have strengthened the mitigating value of Dr. Schmidtgoessling's testimony concerning Froman's depression because she based

it on only "very generic background information" that she "gathered from Froman himself."

{¶179} Froman contends that Dr. Schmidtgoessling "would have been able to use Dr. Stevens' expert knowledge concerning testosterone to better assist her in explaining to the jury that testosterone injections alter brain function" and cause "severe psychological manifestations," including depression. Quoting Dr. Stevens' report, Froman further contends that Dr. Schmidtgoessling "could have explained how testosterone can cause 'serious psychiatric manifestations, including major depression, mania, paranoia, psychosis, delusions, hallucinations, hostility, and aggression.'"

{¶180} Froman's argument here concerning what would have happened in mitigation had Dr. Stevens consulted with Dr. Schmidtgoessling is wholly speculative. Froman submits no "cogent" evidence suggesting that Dr. Schmidtgoessling would have testified in a different manner had she consulted with Dr. Stevens. *See Statzer*, 2018-Ohio-363 at ¶ 16. Instead, his argument simply presumes that Dr. Schmidtgoessling would have repeated all the information contained in Dr. Stevens' report. Froman further assumes that if his counsel provided the jury with information about the effects of testosterone, it would have accepted that testosterone contributed to what occurred or that it in some way mitigated Froman's conduct. But Froman's argument here is just that, argument. The hypothesis that Dr. Schmidtgoessling may have testified about the effects of testosterone had she consulted with Dr. Stevens, and that the jury may have found Dr. Schmidtgoessling's testimony more impactful, does not constitute an "operative fact" demonstrating Froman's entitlement to relief in PCR proceedings. *See Blankenburg* at ¶ 9.

{¶181} Additionally, we note that Froman has never submitted any evidence in support of his PCR petition that indicates that he in fact acted under the influence of testosterone. As discussed in greater detail in response to Froman's third assignment of error, Froman presented no evidence that his actions that day were the result of a "roid

rage." Instead, the evidence indicates that Froman's actions were the result of planning and consideration. Moreover, the PCR petition record reflects that defense counsel were aware of the testosterone issue, having been advised of such by Froman's prior capital counsel. Given the nature of this case and the lack of evidence that Froman acted under the influence of testosterone (or any other substance), that counsel chose not to present a mitigation defense based on expert pharmacological testimony is well within the ambit of trial strategy. *Keith*, 79 Ohio St.3d at 530.

{¶182} For all these reasons, we find that Froman has not set forth sufficient operative facts showing his entitlement to substantive relief with respect to attorney performance during the penalty stage of trial. *Blankenburg* at ¶ 9. Therefore, we find that the trial court did not abuse its discretion in dismissing Grounds 3 and 46. *Id.* We overrule Froman's fifth assignment of error.

**F. Claims Challenging the Constitutionality of Lethal Injection (Ground 32)**

{¶183} Assignment of Error No. 6

{¶184} THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING FROMAN RELIEF ON THE GROUNDS THAT LETHAL INJECTION AS ADMINISTERED IN THE STATE OF OHIO VIOLATES THE UNITED STATES AND OHIO CONSTITUTIONS. U.S. CONST. AMENDS. I, VII, IX, XIV, § § 1, 5, 10, and 16, ARTICLE I OF THE OHIO COSNTITUTION.

{¶185} Froman argues that the death penalty, administered through lethal injection, violates the federal and state constitutional prohibitions against cruel and unusual punishment. Citing a doctor's affidavit written in 2008, Froman argues that the lethal injection protocol adopted by the state in 2016 could cause pain or an inability to monitor whether he is conscious during the lethal injection procedure.

{¶186} We agree with the trial court that res judicata bars Froman's claim because

he could have raised it in his direct appeal. *Myers*, 2021-Ohio-631 at ¶ 63 (holding that res judicata barred constitutional challenges to the death penalty in a postconviction relief case because the petitioner could have raised such challenges on direct appeal). In fact, the record reflects that Froman did argue the unconstitutionality of lethal injection in the fourteenth proposition of law of his brief on direct appeal to the Ohio Supreme Court. The Ohio Supreme Court overruled that proposition of law summarily. *Froman*, 2020-Ohio-4523 at ¶ 159.[11] We may not reconsider Froman's already-rejected argument.

{¶187} The materials submitted in conjunction with Froman's argument about lethal injection are not significant and do not advance Froman's claims beyond the bar of res judicata. *Lindsey*, 2003-Ohio-811 at ¶*22*. The trial court did not abuse its discretion when it dismissed Ground 32 because Froman has failed to demonstrate substantive grounds for relief with respect to lethal injection. *Blankenburg*, 2012-Ohio-6175 at ¶ 9. We overrule Froman's sixth assignment of error.

**G. Claims Challenging the Constitutionality of the Death Penalty (Grounds 29-31)**

{¶188} Assignment of Error No. 7:

{¶189} THE TRIAL COURT ERRED, AND DENIED FROMAN DUE PROCESS AND AN ADEQUATE CORRECTION PROCESS WHEN IT FOUND PROCEDURALLY BARRED FROMAN'S CLAIMS CHALLENGING IN MULTIPLE RESPECTS THE CONSTITUTIONALITY OF OHIO'S DEATH PENALTY STATUTE AND SYSTEMS (GROUNDS 29-31), AND IN SUMMARILY DISMISSING SUCH CLAIMS UNDER R.C. 2953.21 WITHOUT ALLOWING DISCOVERY OR AN EVIDENTIARY HEARING AND IN FAILING TO GRANT RELIEF.

---

11. We note that the Ohio Supreme Court has repeatedly affirmed the constitutionality of lethal injection as a method of administering the death penalty. *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, ¶ 118; *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 131; *State v. Carter*, 89 Ohio St.3d 593, 608 (2000).

**{¶190}** Froman argues that the death penalty is unconstitutional because it is (1) incompatible with modern standards of decency, (2) per se unconstitutional due to unreliability, arbitrariness, and long delays, and (3) per se unconstitutional because it allows for "invidious racial disparities in capital indictment practices." Froman acknowledges that the Ohio Supreme Court has previously rejected these arguments but asserts them here to preserve his ability to present them in federal proceedings.

**{¶191}** Res judicata again bars Froman's claims here because he could has raised such claims in his direct appeal. *Myers*, 2021-Ohio-631 at ¶ 63. Furthermore, the Ohio Supreme Court has previously rejected these arguments. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 184 (noting that the court has held that Ohio does not impose its death-penalty scheme in an arbitrary and racially discriminatory manner and the scheme is neither unconstitutionally vague nor arbitrary and capricious).

**{¶192}** The petition materials submitted in conjunction with this argument are not significant and do not advance Froman's claims beyond the bar of res judicata. *Lindsey*, 2003-Ohio-811 at ¶ *22*. The trial court did not abuse its discretion when it dismissed Grounds 29, 30, and 31 because Froman has failed to show substantive grounds for relief with respect to his arguments about the death penalty. *Blankenburg*, 2012-Ohio-6175 at ¶ 9. We overrule Froman's seventh assignment of error.

### H. Claims Challenging the Postconviction Relief System (Ground 33)

**{¶193}** Assignment of Error No. 8:

**{¶194}** THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED FROMAN RELIEF WITHOUT AFFORDING HIM THE NECESSARY DUE PROCESS TO MEET HIS BURDEN.

**{¶195}** Froman argues that Ohio's postconviction relief system denies him his due process rights because it is not "simple" or "easily invoked," and because it does not permit

meaningful review due to a court's ability to dismiss arguments through doctrines such as res judicata, waiver, and forfeiture. Froman also argues that Crim.R. 35(A), which sets forth a three-page limitation on each ground for relief in a postconviction relief petition, deprived him of the ability to present a complete argument.

{¶196} Froman's complaints about the postconviction relief system and Crim.R. 35 lack merit. Regarding Crim.R. 35, R.C. 2953.21(A)(6) specifies that there is no page limit on a postconviction relief petition in a death penalty case, "notwithstanding any law or court rule to the contrary." This provision stemmed from an amendment to the statute effective April 2017. Froman filed his original petition in October 2018. Thus, if Froman limited his petition to three pages per ground for relief, he simply did not avail himself of R.C. 2953.21(A)(6).

{¶197} As for Froman's challenges to the postconviction relief system, we have repeatedly held that the system provides an adequate corrective process. *State v. Lawson*, 12th Dist. Clermont No. CA2013-12-093, 2014-Ohio-3554, ¶ 43; *State v. Davis*, 12th Dist. Butler No. CA2012-12-258, 2013-Ohio-3878, ¶ 34; *Lindsey*, 2003-Ohio-811 at ¶13. Other districts have held the same. *See State v. Trimble*, 11th Dist. Portage No. 2007-P-0098, 2008-Ohio-6409, ¶ 108; *State v. Frazier*, 6th Dist. Lucas No. L-07-1388, 2008-Ohio-5027, ¶ 70; *State v. Elmore*, 5th Dist. Licking No. 2005-CA-32, 2005-Ohio-5940, ¶ 143-149; *State v. Hessler,* 10th Dist. Franklin No. 01AP-1011, 2002-Ohio-3321, ¶ 85. We find no reason to reconsider our precedent on this issue. Froman has failed to demonstrate substantive grounds for relief with respect to his arguments about the postconviction relief system and the trial court did not abuse its discretion in dismissing Ground 33. *Blankenburg*, 2012-Ohio-6175 at ¶ 9. We overrule Froman's eighth assignment of error.

### I. Cumulative Error Doctrine (Grounds 34 and 35)

{¶198} Assignment of Error No. 9:

{¶199} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED FROMAN FACTUAL DEVELOPMENT AND RELIEF ON THE THIRTY-FOURTH AND THIRTY-FIFTH GROUNDS FOR RELIEF.

{¶200} Froman argues that even if a single error was insufficient to demonstrate grounds for relief, the cumulative effect of all errors that occurred in his trial entitled him to an evidentiary hearing. But for the reasons described above, Froman has demonstrated no errors that occurred at his trial, including no violations of his constitutional rights that render his judgment of conviction void or voidable. The cumulative error doctrine is inapplicable when there are not multiple instances presented of harmless error. *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). Froman has failed to demonstrate substantive grounds for relief with respect to cumulative error and the trial court did not abuse its discretion by dismissing Grounds 34 and 35. *Blankenburg*, 2012-Ohio-6175 at ¶ 9. We overrule Froman's ninth assignment of error.

## J. Claims Challenging the Trial Court's Use of the Doctrine of Res Judicata

{¶201} Assignment of Error No. 1:

{¶202} THE TRIAL COURT ERRED BY APPLYING THE DOCTRINE OF RES JUDICATA TO BAR FROMAN'S GROUNDS FOR RELIEF.

{¶203} Froman argues that the court erred by dismissing 45 of 47 of his Grounds based on res judicata. He contends that he supported many of the Grounds with evidence outside the record and therefore res judicata did not apply. In particular, Froman points to his claims of ineffective assistance of counsel and the various materials he submitted in support of those claims. Froman also contends that the trial court dismissed Grounds 4 through 6 (relating to pretrial publicity and voir dire) based only on res judicata.[12]

---

12. We observe that this argument about Grounds 4 through 6 is an implicit acknowledgment that the trial court provided other, substantive reasons for denying Froman's remaining Grounds.

{¶204} The state defends the trial court's use of the doctrine of res judicata but also contends that the court provided other, substantive reasons for denying each Ground, including Grounds 4 through 6. The state also argues that the vast majority of Froman's grounds for relief are based on matters that Froman did or could have raised on direct appeal and that he is attempting to bypass res judicata by submitting insignificant affidavits and other materials not in the record.

{¶205} Whether the court erred in applying a legal doctrine is a matter of law that we review de novo. *Myers*, 2021-Ohio-631 at ¶ 36. Upon review, we find that we have already addressed the arguments in Assignment of Error No. 1 in the course of analyzing Froman's other assignments of error above. We have either affirmed the trial court's decision on substantive grounds, or affirmed the trial court's use of res judicata, or both. Accordingly, we find this assignment of error is moot and need not be considered. App.R. 12(A)(1)(c).

### III. Conclusion

{¶206} For the reasons described above, we find that the trial court did not abuse its discretion and properly dismissed Froman's PCR petition without an evidentiary hearing. Res judicata bars most of Froman's grounds for relief. In all other instances, the petition, the supporting affidavits, the documentary evidence, the files, and the records of the case failed to demonstrate sufficient operative facts to establish substantive grounds for relief.

{¶207} Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.

–